**Juan C. Chavez**, OSB #136428
Attorney at Law
PO Box 5248
Portland, OR 97208
Telephone: 503-944-2270
Facsimile: 971-275-1839

**Alan Lloyd Kessler**, OSB # 150209
Law Office of Alan L Kessler
1001 SE Sandy Blvd Ste 210
Portland OR, 97214
Telephone: 503-860-1020
Facsimile: 971-275-1839

        Of Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| RECALL TED WHEELER, JOHN SCHROEDER, and MADELINE KAY, | Case No. |
| Plaintiff, | |
| v. | COMPLAINT |
| MARY HULL CABALLERO, Portland City Auditor, and LOUISE HANSEN, Elections Officer, | Civil Rights Action (42 U.S.C. § 1983); Oregon Constitutional Claim. |
| Defendants. | |

COMPLAINT
Page 1 of 24

## OVERVIEW OF CASE

1.      On July 8, 2021, Plaintiffs filed a prospective petition to recall Mayor Ted Wheeler, in accordance with the timeline set forth in ORS 249.875. Defendant Mary Hull Caballero approved the filing and set a date on which Plaintiff could begin gathering signatures, July 9, 2021. Plaintiffs bring this action to challenge Oregon's statutory 90-day signature gathering deadline as inconsistent with Article II, §18 of the Oregon Constitution and the First and Fourteenth Amendments to the U.S. Constitution. Plaintiffs assert as-applied constitutional challenges.

2.      Article II, section 18 of the Oregon Constitution creates the recall power, which allows voters to remove any public elected official from office via special election. To qualify for a recall election under section 18, recall proponents must file a prospective recall petition and obtain sufficient signatures from the electors in the district on behalf of which the elected official has authority to act. Section 18 authorizes municipalities to require up to 15% of the number of district electors who voted in the most recent four-year gubernatorial election. In the city of Portland in 2021, that number was determined to be 47,788.

3.      The Oregon Constitution does not provide a timeline for the gathering of recall petition signatures, nor any means to calculate a deadline by which the necessary number of signatures must be accomplished. Moreover, the Constitution does not authorize the Oregon Legislature to adopt such a deadline. Nevertheless, ORS 249.875(1) establishes a 90-day signature gathering deadline for all recall petitions.

4.      Even if the Oregon Constitution permits the legislature of adopt a statutory deadline for recall petition signature gathering, the 90-day deadline set forth in ORS 249.875(1) is so brief, so unrealistic, and so burdens the recall power, that it impermissibly infringes on peoples' right to

recall their elected officials. This is particularly true during public health emergencies and global pandemics, including but not limited to those related to COVID-19, which can create and have created unprecedented barriers to traditional signature gathering efforts. Such a short timeline is additionally inhibiting of recall efforts during the severe economic contraction resulting from public health efforts to limit social contacts by periodically requiring workers to quarantine and requiring businesses to reduce capacity, thus reducing profitability and continued viability. The economic contraction directly impacts the public's ability to contribute to political campaigns, including those that require paid petition signature gatherers in order to meet an arbitrarily short deadline. Finally, worsening climate change has caused summer of 2021 to be the 5th hottest on record for Portland, and the region saw multiple spans of days during which the heat thwarted efforts to collect signatures outside, the only place where signature gatherers can safely station themselves. For these reasons, ORS 249.875(1) is void as applied under Article II, section 18 of the Oregon Constitution.[1]

5.     Signature gathering for recall elections is core political speech under the First Amendment. The 90-day deadline contained in ORS 249.875(1) is void as applied under the First Amendment because of the great burden of obtaining adequate recall petition signatures, in only 90 days, during a public health emergency and global pandemic, during historic heat conditions and during a historic economic contraction that inhibits political contributions such as those that would enable swift petition signature gathering.

---

[1] Regulations implementing ORS 249.875(1) contain the same 90-day deadline. See OAR 165-014-0005(2) (designating Recall Manual); Whenever Plaintiffs herein challenge the 90-day deadline contained in ORS 249.875(1), they also challenge the 90-day limitation contained in the Recall Manual and any document that replaces or amends it via rulemaking.

7.      By imposing a 90-day signature gathering deadline upon Plaintiffs in reliance of ORS 249.875(1), Defendants violated Plaintiffs' rights under Article II, section 18 of the Oregon Constitution and the First and Fourteenth Amendments of the United States Constitution.

8.      To preserve and defend the right granted to the people by the Oregon Constitution to recall their elected officials, Plaintiffs seek declaratory and injunctive relief declaring ORS 249.875(1) unconstitutional as applied, and enjoining Defendant Caballero and the City of Portland from imposing 90-day recall petition signature gathering deadlines in reliance upon it. Plaintiffs also seek nominal damages for the injury to Plaintiffs' First and Fourteenth Amendment rights should the accompanying motion to stay the imposition of the deadline pending the resolution of this lawsuit be denied.

9.      Accordingly, Plaintiffs bring this as-applied challenge to Defendants' threshold and deadline for signature gathering to trigger a recall election for Mayor Ted Wheeler.

## PARTIES

10.      Plaintiff Recall Ted Wheeler (RTW) is a Petition Committee formed pursuant to ORS § 260.118. RTW's mailing address is P.O. Box 12210 Portland, OR 97212; its physical address is 2249 E. Burnside St. Portland, OR 97214. RTW drafted and filed the prospective recall petition and is advocating for it to qualify for a recall election. RTW is responsible for circulating the petition for signature and otherwise qualifying for a recall election. The interests RTW seeks to protect in this action, in addition to the ability to initiate a recall election, relate to the voting rights of all Oregonians, including supporters and funders of recall campaigns, and these interests are intrinsic to RTW's purpose.

11.     Plaintiff John Schroeder is a Portland, Oregon resident and voter and is a primary contributor to the Recall Ted Wheeler campaign.

12.     Plaintiff Madeline Kay is a Portland, Oregon resident and works as a paid petition circulator for RTW.

13.     Defendant Mary Hull Caballero is the City Auditor for the City of Portland and is named as a Defendant in her official capacity. Ms. Caballero is the chief elections officer in the City of Portland and is charged with the implementation and oversight of 249.875(1).

## JURISDICTION AND VENUE

14.     This is a civil rights action that raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

15.     This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because this action arises under the U.S. Constitution and seeks equitable and other relief for the deprivation of constitutional rights under color of state law.

16.     This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202. Plaintiffs have exhausted available administrative remedies through requesting an extension of time to collect signatures from the City Auditor's office.

17.     This Court has personal jurisdiction over Defendants, who are sued in their official capacity. Defendants Caballero and Hansen are city officials who work in the City Auditor's Office in Portland, which is located in Multnomah County in the State of Oregon.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendants are City officials working in Portland, Oregon. A substantial part of the events giving rise to these claims occurred and continue to occur in this District, making venue also proper under

28 U.S.C. § 1391(b)(2). This case is properly filed in Portland, Oregon and is properly before the

Portland Division of this District pursuant to Local Rule 3-2(b) because Defendants' office is

located in the City of Portland, Multnomah County, State of Oregon, and the events giving rise

to this action took place and continue to occur in the City of Portland.

## FACTUAL BACKGROUND

**A. The Petition**

19.     On July 8, 2021, recall organizers filed a prospective petition with the Portland City

Auditor's Office. See Ex. 1 (prospective petition). The prospective petition contains the

following statement regarding the reasons for the recall:

> Portland has endured years of crisis. When we needed a leader to rise to the
> challenge, Ted Wheeler's inaction made our problems worse. Portlanders have lost
> confidence that their government will be there in times of need. Our city is full of
> good-hearted, decent residents. We should be an example to the world. Instead, with
> Wheeler as mayor, we have veered off course and our city's reputation has been
> tarnished.

> A recall is an expression of democracy designed to remove politicians who aren't
> serving effectively. Portlanders are ready to recover and we can't afford to waste the
> next three-and-a-half years. Portland deserves better than an uninspiring mayor re-
> elected with less than 47% of the vote. We deserve a mayor who was elected without
> personally loaning his campaign $150,000 of his own money in violation of
> Portland's campaign finance laws. Our neighbors, families, and businesses deserve a
> mayor who prioritizes their safety and wellbeing.

> Ted Wheeler has repeatedly demonstrated to too many of use that he does not serve
> this city. Portlanders deserve a fresh start.

20.     On July 9, 2021 Defendant Caballero accepted the prospective petition and issued cover

and signature sheets for use in signature gathering. *See* Ex. 2 (cover and signature sheets).

Caballero also approved an electronic signature sheet for use in signature gathering. *See* Ex. 3

(electronic signature sheet).

21.     At the time she approved the prospective petition for signature gathering, Ms. Caballero established a minimum threshold of 47,788 verified signatures to trigger a recall election. See Or. Const., Article II, section 18(2) (the maximum constitutional recall election threshold is signatures equal to 15% of the number of electors who voted for Governor in the electoral district at the most recent election at which a candidate for Governor was elected to a full term).

22.     Relying on ORS 249.875(1), Defendant Caballero established a 90-day signature submission deadline of October 6, 2021.

23.     On September 22, 2021, Seth Woolley, the treasurer for Total Recall PAC sent a letter to Ms. Caballero requesting that she extend the October deadline.

24.     On September 24, 2021, Louise Hansen, a city elections officer, informed Seth Woolley that his request on behalf of Plaintiffs was denied.

25.     The recall petition campaign, including Plaintiffs' signature gathering efforts, has taken place entirely during the Delta phase of the COVID-19 pandemic and within the period of time covered by Governor Brown's related public health emergency orders. The COVID-19 pandemic made traditional political petition signature gathering very difficult, for a variety of reasons. The economic contraction caused by COVID-19 restrictions also made fundraising more difficult, frustrating the hiring of paid petition signature gatherers in numbers sufficient to meet the numerical threshold by the deadline.

26.     Despite these obstacles, Plaintiffs have been diligently gathering signatures through volunteer efforts as well as staffing paid gatherers. To date, Plaintiffs have gathered around 20,000 signatures. This is roughly 41% of the total verified signatures required by Defendant Caballero.

27.     Ted Wheeler has a 13% approval rating in the City of Portland.

28.    Plaintiffs' entire recall petition campaign effort and signature gathering strategy has been shaped and frustrated by the exigent circumstances surrounding the Delta phase of the pandemic, including reintroduced restrictions, ongoing economic contractions and inability to hire sufficient paid signature gatherers.

**B. COVID-19**

29.    COVID-19 and the actions taken by government to protect public health between March 7, 2020 and the date of this filing has radically changed the predictability of public activity in Oregon. Necessary public health actions have been the result of the adoption of guidance by the federal government, adherence to legal directives issued by the Governor of the State of Oregon, as well as general public attitudes in response to an unprecedented global pandemic, including the Delta variant which is two to three times as infectious as the original variant that caused global shutdowns in March 2020.

    a.    **Effects of the Pandemic on Oregon State Policy**

30.    In March of 2020, Oregon Governor Kate Brown began issuing an escalating series of Executive Orders aimed at protecting public health by restricting public activities and in-person gatherings of unrelated individuals. These Executive Orders, while necessary for public health purposes, severely limited public gatherings that play a central role in signature gathering efforts.

31.    On March 7, 2020, Oregon Governor Kate Brown issued Executive Order No. 20-03, declaring a State of Emergency pursuant to ORS 401.165 *et seq* finding that the novel infectious coronavirus has created a threat to public health and safety, and constitutes a statewide emergency under ORS 401.021(1). The Executive Order established that the state of emergency shall exist for sixty days unless extended or terminated by the Governor.

32.     On March 12, 2020, Governor Brown issued Executive Order No. 20-05 which banned gatherings larger than 250 people and ordered the statewide closure of K-12 schools. The Executive Order applied to community, civic, public, leisure, faith-based, and sporting events, concerts, conventions, fundraisers, and any similar events or activities if a minimum of three feet of space cannot be maintained between participants.

33.     On March 17, 2020, Governor Brown issued Executive Order No. 20-07 which further restricted public movement, required additional social distancing measures, and bans all public gatherings of 25 or more people.

34.     On March 23, 2020, Governor Brown issued Executive Order No. 20-12, which established mandatory social distancing requirements of at least six feet from any person who does not live in same household, with violations subject to penalties described in ORS 401.990. The order includes no end date, stating that it will remain in effect "until terminated by the governor."

35.     On May 1, 2020, Governor Brown signed Executive Order No. 20-24, extending the state of emergency in response to COVID-19 for an additional 60 days through July 6, 2020.

36.     On May 14, 2020, Governor Brown issued Executive Order No. 20-25 which established criteria counties would have to meet before being allowed to move to a phased reopening of businesses and other facilities along with permitting gatherings of gradually increasing number of individuals in those counties.

37.     By June 19, 2020, Oregon's three most populous counties—Multnomah, Washington, and Clackamas—were granted Phase I reopening status. Phase I mandated physical distancing of at least six feet and significant restrictions on large gatherings.

38.    On June 30, 2020, Governor Brown signed HB 4212 into law, which implemented many modifications to statutory deadlines (*e.g.* deadlines for notices of civil claims) and allowed most governmental proceedings to be carried out *via* video- and/or teleconferencing. The extensions to deadlines have been in place since and will remain in place into 2022.

39.    On June 30, 2021, Governor Brown rescinded EO 20-66. However, many masking and social distancing requirements are now a part of state laws and regulations. On August 24th, 2021 Gov Brown reinstituted mask requirements, including wearing masks outdoors when maintaining social distancing of 6 feet was not possible.

40.    OAR 333-019-1025 requires masking wearing when indoors in public spaces and outdoor spaces with people from other households. The regulation specifically states this is because Delta is two to three times more transmissible than the previous variants, and because vaccinated people can contract and infect others with Delta. Moreover, following social distancing requirements for over a year has conditioned people to be avoidant of unnecessary encounters. Have made door to door canvassing and approaching strangers on the street less successful because people are less likely to engage with petition signature gatherers because of the past 18 months of social distancing and avoiding encounters that are not strictly necessary.

**b. Signature-gathering during the pandemic.**

41.    Following the rise of the COVID-19 Pandemic, state and local public health restrictions have largely barred the conduct and strategies on which pre-Pandemic signature collection typically relied. Under normal circumstances, signatures are gathered through a variety of methods, all of which rely on extensive in-person contact. Signature gatherers go out into public spaces, such as markets, public transportation nexuses, and other highly-trafficked areas. Signature gatherers approach strangers with a clipboard, petitions forms, pens, and campaign

paraphernalia. The signature collection process typically requires signature gatherers to speak one-to-one with potential voters in close physical proximity. If a registered voter agrees to sign the petition form, the volunteer hands them the clipboard, the petition form, and a pen.

42.    The volunteer may also give the voter campaign literature and paraphernalia. Naturally, this interaction involves passing items back and forth between the volunteer and voter. Volunteers repeat this type of interaction—in spaces far closer than six feet apart—with at least tens of voters in a typical canvassing "shift." This is exactly the type of activity prohibited by pandemic public health restrictions up until just prior to the date that RTW began collecting signatures. That they are now technically allowed does not erase the past 18 months in which the public has become increasingly used to restrictions that limit contact between strangers. The Delta variant has upended any return to normal interactions, including with signature gatherers for recall petitions.

43.    The disruption of normal signature-collecting methods extends beyond social-distancing restrictions. Through shelter-in-place orders, many Oregonians were ordered under penalty of law to stay at home. Restaurants, government buildings, schools, and other establishments where Plaintiffs traditionally have been able to gather signatures have restricted the number of patrons allowed in the building at any given time. and this access continues to be limited despite the lifting of some restrictions by the government. People had been prohibited for many months from gathering in parks and other areas in substantial numbers. Even now that traditional signature gathering methods are legally permissible, such methods run counter to public health concerns and potentially pose risks to RTW's signature gatherers and potential voters.

44.    Although Oregon does permit campaigns to mail petitions to voters for signature and permits voters to download, print, and sign petitions and then mail them back, these are typically

used as supplemental signature gathering methods and do not produce the same number of

signatures as quickly or efficiently as in person signature gathering. See *Meyer v. Grant*, 486

U.S. 414, 422 (1988) (striking down a prohibition against the use of paid petition circulators and

calling direct one-on-one communication "the most effective, fundamental, and perhaps

economical avenue of political discourse").

45.     In the past, signature gathering campaigns could rely on stationing five signature

gatherers on or near the Eastside MAX stations and netting an average of 14 to 20 signatures per

hour. This provided for almost a third of the signatures collected in a typical Portland campaign.

RTW was never able to achieve more than two signature gatherers averaging 12 signatures per

hour, because MAX ridership has been down by approximately half the normal amount due to

the pandemic and the increase in unhoused people in mental health crisis camped out at MAX

stations and on the trains, making riders and signature gatherers uncomfortable in that space.

Moreover, there is no enforcement of the mask mandate on the MAX trains themselves, which

has resulted in reluctance of signature gatherers to access that venue for collecting signatures.

Despite that, RTW did petition on the MAX, but signature gatherers frequently asked campaign

staff to not continue on the MAX due to feeling unsafe. Workers that were willing to work on the

MAX described it as "apocalyptic" and "tense".

46.     The transit mall downtown, usually a very productive place for signature gatherers to

collect signatures, saw greatly reduced foot traffic, making it impossible to achieve a reasonable

quota. The Trader Joes in Northwest Portland is usually a top spot for petitioning but has had

unusually low foot traffic over the last few months. Citywide, the campaign staff calculated that

half the normal number of people were present in public places as prior to the pandemic. During

the first peak of the pandemic, there were long lines for petitioners to access, but the extreme

contagiousness of the Delta variant has caused fewer people to linger in public spaces. During

the time allowed for signature collection, the Delta variant has caused a spike with the second

highest infections and deaths at any point during the entire pandemic.[2] Oregon health officials

announced Delta had become dominant strain in Oregon as of this date, exactly 14 days after the

campaign was given the go-ahead to collect signatures.[3] Importantly, those first few weeks of

signature gathering were significantly hampered by the Delta variant. This variant is as

transmissible as chicken pox, ICUs filling up with people in their 20s, 30s and 40s—unlike

earlier when most hospitalizations were of much older people.[4] This is partially due to

fluctuating public health measures but largely due to younger people having a lower vaccination

rate, around 60% for people in their 20s. This necessarily impacts people's willingness to engage

in canvassing and engaging with canvassers.

### c. Difficulties in Hiring Related to COVID-19

47.    Hiring workers has been unusually difficult. During nearly the entire collection period

there was augmented unemployment, making jobs such as petitioning and service industry

related jobs undesirable. This has been making national headlines for months. Job postings for

signature gatherers offering pay at $16-$25/hour garnered less than half the number of

respondents than the hiring staff has experienced on previous, pre-COVID-19 and pre-Delta

campaigns. Moreover, many of the campaign's paid petitioners contracted COVID-19 or had a

COVID-19 related health scare, necessitating taking time off for COVID-19 testing and

quarantine, and some paid petitioners quit because the public facing part of this job and its risks

---

[2] KATU Staff, *Rise in Delta variant renews push for vaccinations in Oregon*, KATU News (July 21, 2021),
available at https://katu.com/news/coronavirus/rise-in-delta-variant-renews-push-for-vaccinations-in-oregon;
Genevieve Reaume, KATU Staff, *OHSU doctor says the Delta variant has 'changed the game'*, KATU News (Aug.
2, 2021), available at https://katu.com/news/coronavirus/ohsu-doctor-says-the-delta-variant-has-changed-the-game.
[3] *Id.*
[4] *Id.*

for exposure to COVID-19 made the job too risky. A job focused on interpersonal communication is very challenging with a mask on, especially since the signature gathering requires voluntary cooperation.

## C. CLIMATE CHANGE

48.     The summer of 2021 has been the 5th hottest on record in Portland.[5] There were a total of 12 days since July 8 where the temperature in Portland was over 90. On July 28, the high was 94. On July 29, the high was 98. On July 30, the high was 94. No paid petitioners were sent out those days, and the campaign cautioned volunteers not to collect signatures those days, due to the danger of the extreme heat.

49.     In August, a longer and hotter heat wave struck. Between August 10 and 15, the highs were 93, 102, 106, 96, and 93. Again, the campaign could not ethically send paid petitioners to work in that heat and recommended volunteers stay home. Moreover, the uncertainty as to when petitioners would be able to resume work exacerbated the hiring difficulties.

50.     Accordingly, given the Pandemic's widespread disruption of the activity on which traditional signature gathering depends during the entirety of the period during which RTW was authorized to collect signatures, and the impact of climate change on a city unprepared to meet the challenges of extreme heat, it is not possible for RTW to gather the required number of signatures or meet the signature submission deadline.

**States have taken action to protect political speech during the pandemic**

51.     Oregon and other states, recognizing the extraordinarily disruptive effect of COVID-19 on human interactions and normal means of communicating, have taken affirmative steps

---

[5] Joseph Dames, *July finished as the 5th warmest on record; what can Portland expect for August?*, KOIN News (Aug 2, 2021), available at https://www.koin.com/weather/july-finished-as-the-5th-warmest-on-record-what-can-portland-expect-for-august/.

to adjust their regulations and procedures to help protect and ensure continued political participation.

52.    Prior to the pandemic, Oregon residents could participate in civic life by attending public meetings in person and providing in person testimony. Due to the pandemic, on April 15, 2020, Governor Brown issued an Executive Order requiring that public meetings in the state make available a method for the public to attend the meeting as it is taking place, whether by telephone, video, or other electronic means. Or. Exec. Order No. 20-16 (Apr. 15, 2020).

53.    Other jurisdictions in the U.S. have also taken steps to protect the public's ability to engage in political speech during the Pandemic, including changing the rules for elections and initiatives. For example, sixteen states have either postponed their primary elections in response to the pandemic or moved their election to vote-by-mail, including Alaska, Connecticut, Delaware, Georgia, Hawaii, Indiana, Kentucky, Louisiana, Maryland, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, West Virginia and Wyoming.[6]

54.    Additionally, several courts have granted relief based on the impact of COVID-19 on signature gathering across the United States. A Virginia state court granted a preliminary injunction to reduce the number of signatures needed for candidates to enter Virginia's primary election from 10,000 to 3,000. The court found that "the circumstances as they exist in the Commonwealth of Virginia and across the United States are not normal right now," and that the regulations requiring the signatures were not narrowly tailored because they "do[ ] not provide for emergency circumstances, like those that currently exist." *Faulkner v. Va. Dep't of Elections*, No. CL 20-1456, slip op. at 3 (Va. Cir. Ct. Mar. 25, 2020).

---

[6] Nick Corasantini & Stephanie Saul, *16 States Have Postponed Primaries During the Pandemic. Here's a List.*, N.Y. Times (May 27, 2020), available at https://www.nytimes.com/article/2020-campaign-primary-calendar-coronavirus.html.

55.    For candidates seeking access to the ballot in Massachusetts, the Massachusetts Supreme

Judicial Court ordered a reduction in signature requirements by 50%, an extension of the

deadline for filing signatures, and allowing electronic over wet-ink signatures. The court found

that "these extraordinary times of a declared state of emergency arising from the COVID-19

pandemic create an undue burden on prospective candidate's constitutional right to seek elective

office." *Goldstein v. Sec'y of Commonwealth*, 142 N.E.3d 560, 564 (Mass. 2020).

56.    A federal court in Arkansas granted a motion for preliminary injunction made by the

plaintiffs to allow collecting signatures outside of previous in-person requirements. *Miller v.

Thurston*, No. 5:20-CV-05070 (W.D. Ark. May 26, 2020).

57.    In Nevada, a federal court granted a preliminary injunction that extended the deadline

for submitting a complete petition in light of the pandemic. The court agreed with the

plaintiffs, finding that "as plaintiffs have no chance of getting their initiative on the ballot

without an extension, their First Amendment rights have been violated." *Fair Maps Nevada v.

Cegavske*, No. 3:20-cv-00271, slip op. at 27 (D. Nev. May 29, 2020).

58.    A federal court in Michigan granted a motion for preliminary injunction that lowered

the signature requirement to place an initiative on the ballot and delayed the deadline to file

initiative petitions. The court determined that "the reality on the ground for Plaintiff and other

candidates is that state action has pulled the rug out from under their ability to collect

signatures." *SawariMedia LLC v. Whitmer*, No. 20-CV-11246, slip op. at 6 (E.D. Mich. June

11, 2020).

59.    A Michigan state court suspended a ban on using signatures that are more than 180

days old. *Fair and Equal Michigan v. Benson*, No. 20-000095-MM (Mich. Ct. Cl. Jun. 10,

2020).

The 7th Circuit granted an extension of the petition submission deadline for third party candidates and lowered the number of required signatures. *Libertarian Party of Illinois v. Cadigan*, No. 20-1961 (7th Cir. June 21, 2020).

60.     This Court granted a preliminary injunction on a similar claim in *People Not Politicians Or. v. Clarno*. 472 F. Supp. 3d 890 (D. Or. 2020) ("But when these rules collide with unprecedented conditions that burden First Amendment access to the ballot box, their application must temper in favor of the Constitution. Because the right to petition the government is at the core of First Amendment protections, which includes the right of initiative, *City of Cuyahoga Falls* , 538 U.S. at 196, 123 S.Ct. 1389, the current signature requirements in Oregon law are unconstitutional as applied to these specific Plaintiffs seeking to engage in direct democracy under these most unusual of times.") The United States Supreme Court, however, stayed this Court's preliminary injunction pending Defendant's appeal to the Ninth Circuit. *Clarno v. People Not Politicians Or*., 141 S. Ct. 206, 206 (2020).

61.     RTW requested from Defendant Caballero's office accommodations like those described above, given the challenges faced by RTW during the authorized signature collection period, due to the pandemic and climate change as well as the economics of hiring paid petitioners. Specifically, RTW requested that Oregon's signature submission deadline during this unique time be extended an additional 90 days, to allow for gathering the required number of signatures. The Auditor's office refused RTW's request and made no adjustment to its pre-Pandemic requirements to account for the current exceptional circumstances and burdens on signature-gathering activities.

///

///

**D. Legal Framework: The Recall Right (Or. Const., Art. II, sec 18)**

62.     Adopted via initiative in 1908, Oregon's recall right is contained in Article II, § 18 of the

Oregon Constitution, which states in full as follows:

> "(1) Every public officer in Oregon is subject, as herein provided, to recall by the electors of the state or of the electoral district from which the public officer is elected.

> "(2) Fifteen per cent, but not more, of the number of electors who voted for Governor in the officer's electoral district at the most recent election at which a candidate for Governor was elected to a full term, may be required to file their petition demanding the officer's recall by the people.

> "(3) They shall set forth in the petition the reasons for the demand.

> "(4) If the public officer offers to resign, the resignation shall be accepted and take effect on the day it is offered, and the vacancy shall be filled as may be provided by law. If the public officer does not resign within five days after the petition is filed, a special election shall be ordered to be held within 35 days in the electoral district to determine whether the people will recall the officer.

> "(5) On the ballot at the election shall be printed in not more than 200 words the reasons for demanding the recall of the officer as set forth in the recall petition, and, in not more than 200 words, the officer's justification of the officer's course in office. The officer shall continue to perform the duties of office until the result of the special election is officially declared. If an officer is recalled from any public office the vacancy shall be filled immediately in the manner provided by law for filling a vacancy in that office arising from any other cause.

> "(6) The recall petition shall be filed with the officer with whom a petition for nomination to such office should be filed, and the same officer shall order the special election when it is required. No such petition shall be circulated against any officer until the officer has actually held the office six months, save and except that it may be filed against a senator or representative in the legislative assembly at any time after five days from the beginning of the first session after the election of the senator or representative.

> "(7) After one such petition and special election, no further recall petition shall be filed against the same officer during the term for which the officer was elected unless such further petitioners first pay into the public treasury which has paid such special election expenses, the whole amount of its expenses for the preceding special election.

> "(8) Such additional legislation as may aid the operation of this section shall be provided by the legislative assembly, including provision for payment by the public treasury of the reasonable special election campaign expenses of such officer. But the

words, "the legislative assembly shall provide," or any similar or equivalent words in this constitution or any amendment thereto, shall not be construed to grant to the legislative assembly any exclusive power of lawmaking nor in any way to limit the initiative and referendum powers reserved by the people."

63.    Article II, § 18 contains no time limitation on signature gathering, except for the obvious and implicit requirement that signatures be gathered during the elected official's term of office.

64.    Nor does section 18 authorize the legislative assembly to establish a time limitation for signature gathering. Although subsection (8) authorizes the Oregon Legislature to enact statutes "as may aid the operation of this section," the Oregon Supreme Court has interpreted the word "aid" in section 18 to mean "to support, help, or assist." *State ex rel. Clark v. Harris*, 74 Or 573, 580 (1914). A statutory signature gathering time limitation does not "support, help, or assist" the operation of section 18. Instead, such a statutory time limit impermissibly curtails and burdens section 18's self-executing recall power. See *Harris*, 74 Or at 585 (section 18 is self-executing and requires no implementing legislation).

65.    Subsection 18(2) imposes a ceiling on how many signatures recall petitioners may be required to file in order to trigger a special recall election. That maximum threshold is 15% of the number of electors who voted for Governor in the electoral district at the most recent election at which a candidate for Governor was elected to a full term. Id. Section 18 does not specify a minimum threshold for signatures.

66.    The Oregon Supreme Court has held that, in the absence of legislation or a municipal charter provision electing a lower percentage threshold for recalls, the maximum percentage threshold applies. See Harris, 74 Or at 579-80 (applying maximum percentage threshold of 25 percent under original version of Article II, section 18); *State ex rel. Postlethwait v. Clark*, 143 Or 482, 488 (1933) (looking first to the charter of the City of Baker in evaluating applicable recall procedure). Therefore, in the absence of an applicable local or statewide downward

election, the default signature threshold for recalls is 15%. The Oregon Legislature has elected

the 15% maximum, *see* ORS 249.870, while Oregon City has not made an affirmative election,

and therefore defaults to the 15% threshold. The Statutory 90-Day Limitation - ORS 249.875(1)

67.     As part of the 1933 recall legislation package, the legislative assembly adopted the 90-

day signature gathering limitation as part of what became former O.C.L.A. 81-2202. That statute

was renumbered as former ORS 254.420 in 1953, and became ORS 249.875(1) in 1979.

68. The current statute, ORS 249.875(1), reads as follows: "A recall petition shall be void unless

completed and filed not later than the 100th day after filing the prospective petition described in

ORS 249.865. Not later than the 90th day after filing the prospective petition the petition shall be

submitted to the filing officer who shall verify the signatures not later than the 10th day after the

submission. The filed petition shall contain only original signatures. A recall petition shall not be

accepted for signature verification if it contains less than 100 percent of the required number of

signatures. The petition shall not be accepted for filing until 100 percent of the required number

of signatures of electors have been verified." *Id*.

69.     No known Oregon trial court or appellate decision has ever addressed the

constitutionality of the 90-day signature-gathering limitation.

70.     The First Amendment and Fourteenth Amendment to the United States Constitution secure

the rights of Oregonians to speech and political expression free from government interference or

hinderance. Circulation of petitions is core protected speech. *Prete v. Bradbury*, 438 F.3d 949, 961

(9th Cir. 2006); see also *Meyer v. Grant*, 486 U.S. 414, 420 (1988).

71.     Regulations and restrictions on the right to vote and engage in political expression is

assessed under the sliding-scale standards established by *Anderson v. Celebrezze*, 460 U.S. 780

(1984) and *Burdick v. Takushi*, 504 U.S. 428 (1992). If Plaintiffs establish a severe burden on

these rights, then strict scrutiny applies. *See, e.g.*, *Harper v. Virginia Board of Elections*, 383 U.S. 663 (1966).

## CAUSES OF ACTION

### CLAIM 1: Oregon Constitutional Violation (As Applied)

72.     The 90-day signature gathering limitation contained in ORS 249.875(1) does not "aid," unduly burdens, is not authorized by, and violates the recall right of Article II, section 18 of the Oregon Constitution as applied. It is therefore void and unenforceable with respect to the October 6, 2021 signature gathering deadline imposed by Defendants.

73.     Specifically, in light of the public health emergency created by the COVID-19 pandemic and the impacts of climate change and adverse economic conditions, the 90- day signature gathering limitation contained in ORS 249.875(1) is void as applied under Article II, section 18 of the Oregon Constitution. Accordingly, the October 6, 2021 signature gathering deadline imposed by Defendants violated plaintiffs' recall rights under Article II, section 18 of the Oregon Constitution.

### CLAIM 2: U.S. Constitution First and Fourteenth Amendments Violations (As Applied)

74.     Plaintiffs reallege and incorporate by reference all prior paragraphs as though fully set forth herein.

75.     The challenged restrictions, Oregon's pre-Pandemic signature count requirement and submission deadline as applied to RTW during the Pandemic and related public health orders, impose a severe burden on the Plaintiffs' First and Fourteen Amendment rights securing the rights to speak, seek redress, associate, and recall politicians by making it nearly impossible to petition for a recall election. This severe burden earns strict scrutiny for the challenged

regulations under the *Anderson/Burdick* standard. *Angle v. Miller*, 673 F.3d 1122, 1133 (9th Cir. 2012).

76.    Defendants' maintenance of both the pre-Pandemic number of signatures required as well as the deadline for submitting signatures cannot survive strict scrutiny considering the government regulations in response to the COVID-19 pandemic. The requirements as applied to RTW are not narrowly tailored to further a compelling government interest.

77.    Moreover, Defendant has no compelling interest in effectively barring the Recall. The Defendant's interest in ensuring that the Recall has enough verified public support before initiating a recall election can be accomplished through less restrictive means.

78.    Requiring the Initiative to be submitted for verification with 47,788 signatures by October 6, 2021 will likely unnecessarily preclude RTW from successfully petitioning for a recall. More time can—and should be—allotted to collect and verify signatures, and/or the signature threshold should be lowered to ensure Plaintiffs' right to engage in political speech is sufficiently protected. Doing so will not compromise the government's interest in ensuring that only sufficient support for a recall exists before initiating a recall. Even if more time is allotted to gather the required signatures, the Defendants and other employees in the Elections office will have sufficient time to verify the recall. And even if fewer signatures are required to be submitted for verification, the Defendants and other elections employees will still be able to confirm the significant voter support for initiating a recall election.

79.    Absent relief from this Court, Plaintiffs will suffer irreparable harm. Plaintiffs have no adequate remedy at law. If the court does not order relief, Plaintiffs will be prevented from engaging in constitutionally protected speech in violation of the First and Fourteenth

Amendments. In addition, Plaintiffs will be unable to place before the voters an option to recall a mayor who is substantially unpopular.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs respectfully request that this Court:

1.      Declare that the application of ORS 249.875(1) and all related laws, rules, or policies, as applied to the Recall violates the U.S. Constitution by unduly burdening the recall process.

2.      In the alternative, declare that the application of ORS 249.875(1) and all related laws, rules, or policies, as applied to the Recall violates the U.S. Constitution by unduly burdening the recall process.

3.      Declare that the application of ORS 249.875(1) and all related laws, rules, or policies violates the Oregon Constitution by unduly burdening signature gathering efforts in support of the Recall.

4.      In the alternative, declare that the application of ORS 249.875(1) and all related laws, rules, or policies, as applied to the Recall, violates the Oregon Constitution by unduly burdening signature gathering efforts in support of the Recall.

5.      Enjoin enforcement of signature submission and verification deadlines, and all related laws, rules, or policies, as applied to the Recall.

6.      Enjoin enforcement of signature totals requirement, and all related laws, rules, or policies, as applied to the Recall.

7.      Enjoin enforcement of physical signature requirements, and all related laws, rules, or policies, and allow for digital signature collection as applied to the Recall.

8.      Award plaintiffs their costs and reasonable attorney fees, pursuant to:

A.  The public benefit doctrine, exemplified by *Deras v. Myers*, 272 Or 47, 66-67,

535 P2d 541 (1975), *Leppanen v. Lane Transit District*, 181 Or App 136, 149,

45 P3d 501 (2002), *Swett v. Bradbury*, 335 Or 378, 67 P3d 391 (2003), and

*Kerr v. Bradbury*, 194 Or App 133, 93 P3d 841 (2004);

B.  The substantial benefit doctrine, exemplified by *Crandon Capital Partners v.*
*Shelk*, 342 Or 555, 564, 157 P3d 176 (2007) and *De Young v. Brown*, 300 Or

App 530, 451 P3d 651 (2019); and/or

C.  42 U.S.C. § 1988(b).

9.      Providing all other and further relief as to which Plaintiffs may be entitled and which the

Court may deem just and equitable.

DATED: October 4, 2021

Respectfully Submitted,

/s/ *Juan C. Chavez*
Juan C. Chavez, OSB #136428
PO Box 5248
Portland, OR 97208

*ATTORNEY TO BE NOTICED*

/s/ *Alan Lloyd Kessler*
Alan Lloyd Kessler, OSB # 150209
Law Office of Alan L Kessler
1001 SE Sandy Blvd Ste 210
Portland OR, 97214

*ATTORNEY TO BE NOTICED*