**Juan C. Chavez**, OSB #136428
Attorney at Law
PO Box 5248
Portland, OR 97208
Telephone: 503-944-2270
Facsimile: 971-275-1839

**Alan Lloyd Kessler**, OSB # 150209
Law Office of Alan L Kessler
1001 SE Sandy Blvd Ste 210
Portland OR, 97214
Telephone: 503-860-1020
Facsimile: 971-275-1839

    Of Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| RECALL TED WHEELER, JOHN SCHROEDER, and MADELINE KAY, | Case No. 3:21-cv-01448-MO |
| Plaintiff, | |
| v. | MOTION FOR TEMPORARY RESTRAINING ORDER |
| MARY HULL CABALLERO, Portland City Auditor, and LOUISE HANSEN, Elections Officer, | |
| Defendants. | |

## <u>MOTION FOR TEMPORARY RESTRAINING ORDER</u>

Pursuant to Fed. R. Civ. P. 65(a) and (b)(1), Plaintiffs request issuance of a Temporary Restraining Order and Preliminary Injunction. Plaintiffs' application demonstrates that "immediate and irreparable injury, loss, or damage will result to the movant[s]." Fed. R. Civ. P. 65(b)(1)(A).

Plaintiffs request an order enjoining Defendants from enforcing those portions of ORS 249.875 and all associated laws, administrative rules, and policies requiring the submission of at least 47,788 signatures by October 6, 2021 in order to recall Mayor Ted Wheeler from office. Defendants may accomplish this by removing or modifying Recall Ted Wheeler's deadline for submitting signatures, accepting digital and/or electronic signatures, and/or reducing the number of signatures required to be submitted.

Plaintiffs request an expedited hearing and relief on or before October 21, 2021.

Plaintiff's Motion is supported by the below Memorandum of Law, and the Declarations of John Schroeder and Greg Bourget.

TABLE OF CONTENTS

**I. INTRODUCTION** ....................................................................................................... 5

**II. STATEMENT OF FACTS** ....................................................................................... 6

   A. The Campaign and Goals ........................................................................................... 6

   B. The State's Pandemic-related Restrictions on Signature Gathering ...................... 9

      1. Effects of the Pandemic on Oregon State Policy ........................................... 9

   C. RTW's extraordinary signature-gathering efforts despite restrictions on signature gathering ...................................................................................................................... 11

   D. Oregon Election Officials Recognized the Need to Modify Other Elections Processes in Light of COVID-19 ......................................................................................................... 13

   E. Numerous Courts in Other States Have Modified Election Requirements to Protect Political Rights in Light of COVID-19 ............................................................................... 14

**III. STANDARD OF LAW** .......................................................................................... 17

**IV. ARGUMENT** ........................................................................................................ 18

   A. Plaintiffs Are Likely to Succeed on the Merits of Their State Constitutional Claims ....... 18

      1. Art. 2, § 18 of the Oregon Constitution Supports Plaintiff's Sought Relief ................ 19

   B. Plaintiffs Are Likely to Succeed on the Merits of Their Federal Constitutional Claims ... 19

      1. As applied during the Pandemic-related government restrictions on Plaintiffs, Oregon's signature-submission deadline restricts one-on-one communication between petition circulators and voters. ...................................................................................................... 21

      2. As applied during the Pandemic-related government restrictions on Plaintiffs, Oregon's signature threshold and signature-submission deadline both make it less likely that proponents will be able to garner the signatures necessary to place an initiative on the ballot. .................................................................................................................................. 21

         a. Plaintiffs' efforts to gather signatures under extraordinary circumstances have far exceeded reasonable diligence. ................................................................................... 22

         b. Oregon's signature threshold and signature-submission deadline both significantly inhibit Recall Ted Wheeler's ability to initiate a recall election. ............................... 24

         c. Defendants' arbitrary 47,788 signature threshold cannot survive strict scrutiny in these unique circumstances .......................................................................................... 27

         d. Defendants' submission deadline cannot survive strict scrutiny in these unique circumstances .............................................................................................................. 29

   C. Plaintiffs Will Suffer Irreparable Harm Without an Injunction ........................................ 30

   D. The Balance of Equities Sharply Favors Plaintiffs .......................................................... 30

   E. An Injunction Would Serve the Public Interest ................................................................ 31

**V. CONCLUSION** ....................................................................................................... 32

MOTION FOR TEMPORARY RESTRAINING ORDER

TABLE OF AUTHORITIES

**Cases**

*Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127 (9th Cir. 2011) .............................. 19, 20
*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ............................................................................ 26
*Angle v. Miller*, 673 F.3d 1122 (9th Cir. 2012) .................................................................... passim
*Associated Press v. Otter*, 682 F.3d 821 (9th Cir. 2012) ............................................................ 33
Benda v. Grand Lodge of Int'l Ass'n. of Machinists & Aerospace Workers, 584 F.2d 308
    (9th.Cir. 1978) ....................................................................................................................... 20
*Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182 (1999) .......................................... 22, 23
*Burdick v. Takushi,* 504 U.S. 428 (1992) ..................................................................................... 27
*City of Cuyahoga Falls Ohio v. Buckeye Cmty. Hope Found.*, 538 U.S. 188 (2003) .................. 22
*Democratic National Comittee v. Bostelmann*, 451 F.Supp.3d 952 (W.D. Wis. Apr. 2, 2020)... 17
*Elrod v. Burns*, 427 U.S. 347 (1976) ........................................................................................... 33
*Esshaki v. Whitmer*, 455 F.Supp.3d 367 (E.D. Mich. Apr. 20, 2020) ............................. 17, 30, 31
*Esshaki v. Whitmer*, 461 F.Supp.3d 646, (E.D. Mich. May 20, 2020) ........................................ 18
*Esshaki v. Whitmer*, 813 Fed.Appx. 170 (6th Cir. May 5, 2020) .................................... 18, 30, 31
*Fair Maps Nevada v. Cegavske*, 463 F.Supp.3d 1123 (D. Nev. May 29, 2020) .................. passim
*Faulkner v. Va. Dep't of Elections*, 104 Va. Cir. 373 (Va. Cir. Ct. Mar. 25, 2020). .............. 16, 30
*Goldstein v. Sec'y of Commonwealth*, 484 Mass. 516 (Mass. 2020)................................ 17, 30, 32
*Harper v. Virginia State Board of Elections*, 383 U.S. 663 (1966). ............................................ 27
Koller v. Brown, 224 F. Supp. 3d 871 (N.D. Cal. 2016) ............................................................. 20
*Libertarian Party of Illinois v. Pritzker*, 455 F.Supp.3d 738 (N.D. Ill. Apr. 23, 2020) ......... 17, 30
*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012)..................................................................... 33
*Meyer v. Grant*, 486 U.S. 414 (1988) ..................................................................................... passim
*Natural Res. Def. Council, Inc.  v. Winter*, 518 F.3d 658 (9th Cir. 2008) ............................. 19, 20
*Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117 (2011)......................................................... 22
*Perry Educ. Ass'n v. Perry Educators' Ass'n,* 460 U.S. 37 (1983) ............................................ 27
*Prete v. Bradbury*, 438 F.3d 949 (9th Cir. 2006)........................................................................ 29
*SawariMedia LLC v. Whitmer*, 466 F.Supp.3d 758 (E.D. Mich June 11, 2020) ................... passim
*State ex rel. Postlethwait v. Clark*, 143 Or. 482 (Or. 1933),...................................................... 21
Univ. of Tex. v. Camenisch, 451 U.S. 390 (1981) ...................................................................... 20
*Warsoldier v. Woodford*, 418 F.3d 989 (9th Cir. 2005)............................................................... 34
*Winter v. Natural Res. Def. Council*, 555 U.S. 7 (2008) ............................................................. 19

**Statutes**

ORS 249.875................................................................................................................... 10, 23
ORS 250.105.......................................................................................................................... 33
ORS 401.165.......................................................................................................................... 12
ORS 401.990.......................................................................................................................... 12

**Constitutional Provisions**

Mich. Const., 1963, Art. 2, § 9.................................................................................................. 19
Or. Const., Art. II, § 18 ...................................................................................................... 9, 21, 30
U.S. Const. Amend. I............................................................................................................ 21, 22

## MEMORANDUM OF LAW

### I. INTRODUCTION

The COVID-19 Pandemic ("the Pandemic") and responsive "Stay Home, Save Lives" government orders upended normal life. The mundane social act of approaching strangers in a crowd to collect signatures on a petition has been complicated and frustrated by the pandemic in many ways, such as regulations mandating or recommending outdoor masking, social distancing restrictions, and drastically reduced foot traffic in public spaces.

Pandemic-related public health restrictions are undoubtedly important protections, they impose significant burdens on democratic participation. Plaintiffs are in the unique and unfortunate position of attempting to collect signatures during not only a new, more deadly phase of an already unprecedented pandemic, but historic heat waves due to climate change. Hiring and retaining sufficient signature gatherers has been severely hampered due to augmented unemployment benefits, COVID-19-related health scares and quarantines due to exposure, a populace that has greatly reduced its interactions with the outside world, and a new, more deadly phase of an already unprecedented pandemic.

Faced with multiple and novel barriers to signature collection, Plaintiffs have nevertheless diligently pursued signature collection through volunteer and paid efforts. Unlike with almost every other aspect of life, no accommodations have been allowed to petitioners; the Secretary of State and the Auditor of the City of Portland have insisted on pen-and-ink original signatures, even when their offices have operated largely remotely. Although Ted Wheeler's approval rating is now at merely 13%—showing that many Portland voters are dissatisfied with his leadership—the campaign is far from obtaining enough signatures to meet the 15% threshold it must meet to recall this incredibly unpopular, embattled mayor. Without an extension of time

to address the numerous, unprecedented impediments to the process, Plaintiffs will fall short of

Oregon's pre-Pandemic signature requirements. Through no fault of their own, Plaintiffs now

stand unable to exercise their fundamental First Amendment rights to participate in the recall

process

The United States Constitution requires Oregon's election regulations, like all other

aspects of life, to adapt to the Pandemic's exceptional circumstances. Courts across the country

have recently provided relief to parties, like Plaintiffs, who have struggled to meet election

requirements created for a world that looks nothing like the present day. Given Plaintiffs'

diligent efforts to comply with Oregon's initiative signature requirements during exceptional

circumstances, and the practically insurmountable burden those requirements now impose on

Plaintiffs' First Amendment rights to participate in the political process, this Court should grant

RTW's request for injunctive relief.

## II. STATEMENT OF FACTS

### A. The Campaign and Goals

Recall Ted Wheeler ("RTW") is a political committee formed to petition or the recall of

Portland mayor, Ted Wheeler, Plaintiff John Schroder is volunteer and a primary contributor to

RTW, and Plaintiff Madeline Kay is a paid petition circulator for RTW. *Schroder Decl.* ⁋ 2-4.

Plaintiff RTW filed a prospective petition with the Portland City Auditor's Office on July 8,

2021. *See* Ex. 1 (prospective petition). *Id.* at ⁋ 5.  The prospective petition contains the

following statement regarding the reasons for the recall:

> Portland has endured years of crisis. When we needed a leader to
> rise to the challenge, Ted Wheeler's inaction made our problems
> worse. Portlanders have lost confidence that their government will
> be there in times of need. Our city is full of good-hearted, decent
> residents. We should be an example to the world. Instead, with

Wheeler as mayor, we have veered off course and our city's reputation has been tarnished.

A recall is an expression of democracy designed to remove politicians who aren't serving effectively. Portlanders are ready to recover and we can't afford to waste the next three-and-a-half years. Portland deserves better than an uninspiring mayor re-elected with less than 47% of the vote. We deserve a mayor who was elected without personally loaning his campaign $150,000 of his own money in violation of Portland's campaign finance laws. Our neighbors, families, and businesses deserve a mayor who prioritizes their safety and wellbeing.

Ted Wheeler has repeatedly demonstrated to too many of use that he does not serve this city. Portlanders deserve a fresh start.

*Id.* ¶ 6, Ex. 1.

On July 9, 2021 Defendant Caballero accepted the prospective petition and issued cover and signature sheets for use in signature gathering. *Id.* ¶ 7-8, Ex. 2. Caballero also approved a so-called "electronic signature sheet" for use in signature gathering. *Id.* ¶ 9-10, Ex. 3.

At the time she approved the prospective petition for signature gathering, Ms. Caballero established a minimum threshold of 47,788 verified signatures to trigger a recall election. *Id.* ¶ 13; Or. Const., Art. II, § 18(2) (the maximum allowable recall election threshold is signatures equal to 15% of the number of electors who voted for Governor in the electoral district at the most recent election at which a candidate for Governor was elected to a full term).

Defendants required pen-and-ink signatures directly applied by the voter rather than any digitally signed, scanned, copied, faxed, or otherwise electronically captured signatures. *Id.* ¶ 11. Notwithstanding its name, the electronic signature sheet was required to be printed by or on request of the voter signing it and could only be used with physical pen-and-ink signatures. *Id.* Would-be signers frequently asked the campaign whether electronic signatures

were allowed, and were often surprised to find that only wet signatures would be accepted by Defendants. *Id*. ⁋ 12.

Relying on ORS 249.875(1), Defendant Caballero established a 90-day signature submission deadline of October 6, 2021. *Id*. ⁋ 14.

On August 16, 2021 and August 17, 2021 Plaintiff John Schroder emailed the Oregon Secretary of State on behalf of RTW inquiring as to whether electronically signed copies of the "electronic signature sheet" would be permitted; the answer was "no." *Id*. ⁋ 15-16, Ex. 4.

On September 22, 2021, Seth Woolley, the treasurer for Total Recall PAC sent a letter to Ms. Caballero to withdraw her October deadline. *Id*. ⁋ 17-18, Ex. 5.

On September 24, 2021, Louise Hansen, a city elections officer, informed Seth Woolley that his request on behalf of Plaintiffs was denied. *Id*. ⁋ 19-20, Ex. 6.

The recall petition campaign, including Plaintiffs' signature gathering efforts, has taken place entirely during the phase of the COVID-19 pandemic created by the Delta variant of the virus ("Delta") and within the period of time covered by Governor Brown's related public health emergency orders.  *Id*. ⁋ 21. The COVID-19 pandemic made traditional political petition signature gathering very difficult, for a variety of reasons. Despite these obstacles, Plaintiffs have been diligently gathering signatures through volunteer efforts as well as staffing paid gatherers. *Id*. ⁋ 22.To date, Plaintiffs have gathered over 21,000 signatures. *Id*. ⁋ 23. This is roughly 44% of the total verified signatures required by Defendants. *Id*.

Plaintiffs are continuing to gather signatures, however, its volunteer and financial resources are substantially constrained in light of the purported October 6th deadline having passed, creating a perception among the public that the effort has failed. *Id*. ⁋ 24.

Plaintiff RTW was sufficiently funded to complete its petition within the arbitrary timeline under normal circumstances. *Bourget Decl.* ⁋ 24. RTW followed best practices and proven circulation strategies. *Id.* ⁋ 25. The effort did not fail because the public is not interested in a recall; according to recent polling, Ted Wheeler currently has a 13% approval rating in the City of Portland. *Schroder Decl.* ⁋ 25

Plaintiffs' entire recall petition campaign effort and signature gathering strategy has been shaped and frustrated by the exigent circumstances surrounding the Delta phase of the pandemic, including reintroduced restrictions, ongoing economic and inability to hire sufficient paid signature gatherers.

**B. The State's Pandemic-related Restrictions on Signature Gathering**

COVID-19 and the actions taken by government to protect public health between March 7, 2020 and the date of this filing has radically changed the predictability of public activity in Oregon. Necessary public health actions have been the result of the adoption of guidance by the federal government, adherence to legal directives issued by the Governor of the State of Oregon, as well as general public attitudes in response to an unprecedented global pandemic, including the Delta variant which is two to three times as infectious as the original variant that caused global shutdowns in March 2020.

1. Effects of the Pandemic on Oregon State Policy

In March of 2020, Oregon Governor Kate Brown began issuing an escalating series of Executive Orders aimed at protecting public health by restricting public activities and in-person gatherings of unrelated individuals. These Executive Orders, while necessary for public health purposes, severely limited public gatherings that play a central role in signature gathering efforts.

On March 7, 2020, Oregon Governor Kate Brown issued Executive Order No. 20-¬03, declaring a State of Emergency pursuant to ORS 401.165 et seq finding that the novel infectious coronavirus has created a threat to public health and safety, and constitutes a statewide emergency under ORS 401.021(1). The Executive Order established that the state of emergency shall exist for sixty days unless extended or terminated by the Governor.

On March 12, 2020, Governor Brown issued Executive Order No. 20-05 which banned gatherings larger than 250 people and ordered the statewide closure of K-12 schools. The Executive Order applied to community, civic, public, leisure, faith-based, and sporting events, concerts, conventions, fundraisers, and any similar events or activities if a minimum of three feet of space cannot be maintained between participants.

On March 17, 2020, Governor Brown issued Executive Order No. 20-07 which further restricted public movement, required additional social distancing measures, and bans all public gatherings of 25 or more people.

On March 23, 2020, Governor Brown issued Executive Order No. 20-12, which established mandatory social distancing requirements of at least six feet from any person who does not live in same household, with violations subject to penalties described in ORS 401.990. The order includes no end date, stating that it will remain in effect "until terminated by the governor."

On May 1, 2020, Governor Brown signed Executive Order No. 20-24, extending the state of emergency in response to Covid-19 for an additional 60 days through July 6, 2020.

On May 14, 2020, Governor Brown issued Executive Order No. 20-25 which established criteria counties would have to meet before being allowed to move to a phased reopening of

businesses and other facilities along with permitting gatherings of gradually increasing number of individuals in those counties.

By June 19, 2020, Oregon's three most populous counties–Multnomah, Washington, and Clackamas–were granted Phase I reopening status. Phase I mandated physical distancing of at least six feet and significant restrictions on large gatherings.

On June 30, 2021, Governor Brown rescinded EO 20-66. However, many masking and social distancing requirements are now a part of state laws and regulations. On August 24th, 2021 Governor Brown reinstituted mask requirements, including wearing masks outdoors when maintaining social distancing of 6 feet was not possible.

OAR 333-019-1025 requires masking wearing when indoors in public spaces and outdoor spaces with people from other households. The regulation specifically states this is because Delta is two to three times more transmissible than the previous variants, and because vaccinated people can contract and infect others with Delta. Moreover, following social distancing requirements for over a year has conditioned people to be avoidant of unnecessary encounters.

The unique conditions of this past summer made door-to-door canvassing and approaching strangers on the street less successful because people are less likely to engage with petition signature gatherers because of the past 18 months of social distancing and avoiding encounters that are not strictly necessary.

## C. RTW's extraordinary signature-gathering efforts despite restrictions on signature gathering

By the time RTW was authorized to begin its signature collection efforts to petition for the Recall, the routines and behaviors of the general public on which the petitioning process typically relied were no longer present. *Bourget Decl.* ¶ 30. RTW's petition circulators could

not smile at strangers and casually approach to hand them petitions; these once-normal routines were suddenly dangerous, socially unacceptable, and—to varying degrees during the petitioning period—illegal. *Id*. ⁋ 31. The social gatherings of people that would have facilitated contact with large numbers of voters were prohibited. *Id*. ⁋ 32. Petitioning in public forums, typically the most effective form of signature gathering, was stymied by the relative absence of people in public as well as understandable caution by those who remained. *Id*. ⁋ 33

Despite these tremendous challenges, RTW has engaged in a good faith effort to meet the qualifying signature requirements using conventional and unconventional petitioning methods. *Id*. ⁋ 34. Although some parts of this campaign are straightforward—for example, RTW created a website portal allowing Portlanders to download petitions and signature pages at home—key aspects are acutely burdensome. *Id*. ⁋ 35. Most homes do not have the capacity to print documents on the required 20-pound paper, and any printed petition would still need to be addressed and mailed by the signing party, creating additional barriers to participation. Or. Admin. R. 165-014-0005; *Bourget Decl.*, ⁋ 36.

RTW gathered donations in excess of $147,000 from donors. *Id*. ⁋ 37 Historically, this money would have been more than enough to ensure success of the signature-gathering campaign through a combination of volunteer and paid circulators. *Id*. ⁋ 38  Before the pandemic, it cost approximately $2.20 per signature obtained by paid circulators on comparable campaigns. *Id*. ⁋ 39.

In a typical petitioning effort, a campaign would use about 20 circulators at high-foot-traffic locations around the City and would be able to obtain 47,788 signatures in two months at a cost of $105,000 which includes all labor, administrative, and material costs. *Id*. ⁋ 15.  Had RTW been able to collect signatures in the usual manner under pre-Pandemic circumstances, it

would have met the signature requirement in a 7-week period before the October 6, 2021

submission deadline. *Id.* ¶ 8. Despite these efforts, the Delta's frustration of the traditional

signature collection methods has proven insurmountable and RTW obtained only 21,000 of the

47,788 signatures required by Defendants by their deadline. *Id.* ¶ 40; *Schroder Decl.* ¶ 27.

**D. Oregon Election Officials Recognized the Need to Modify Other Elections Processes in Light of COVID-19**

On March 19, 2020, Oregon's Secretary of State determined that "[b]ecause Oregon votes

by mail we do not have to be concerned about social distancing issues," so she moved forward

with the May 19 primary election while also developing "[c]ontingency plans . . . to deal with

any impacts the COVID-19 virus may have on our election processes."[1]

On March 24, 2020, in light of the Governor's Executive Order one day earlier, the

Secretary suspended most agency in-person services and began requiring appointments

for limited in-person elections services.[2] These restrictions continue today.[3]

On June 12, 2020, the Secretary convened the first meeting of the Financial Estimate

Committee as a live-streamed remote meeting, despite having only four members and a few

staff.[4] The Secretary chairs this committee, which drafts financial estimates of potential ballot

---

[1] Press Release, Oregon Secretary of State, May Primary Moves Forward as Planned (Mar. 19, 2020), https://www.oregon.gov/newsroom/Pages/NewsDetail.aspx?newsid=36214.

[2] Press Release, Oregon Secretary of State, Service Impacts to Secretary of State (Mar. 23, 2020), https://www.oregon.gov/newsroom/Pages/NewsDetail.aspx?newsid=36242; Press Release, Oregon Secretary of State, News from the Secretary of State (Apr. 15, 2020), https://www.oregon.gov/newsroom/Pages/NewsDetail.aspx?newsid=36377 ("In light of the Governor's Executive Order and the current health situation in general, I have ordered my staff to suspend in-person services normally offered by Secretary of State's office until further notice. The vast majority of public needs can be addressed online, by phone, or email. Statutorily required in-person services will be available by appointment only.").

[3] Secretary of State Response to COVID-19, Oregon Secretary of State Bev Clarno (last visited Jun. 29, 2020), https://sos.oregon.gov/Pages/covid-19.aspx ("All in-person services normally offered by Secretary of State are suspended until further notice.").

[4] Press Release, Secretary of State, Financial Estimate Committee Meeting: June 12, 2020 (Jun. 8, 2020), https://www.oregon.gov/newsroom/Pages/NewsDetail.aspx?newsid=36761.

measures for the voters' pamphlet. As chair, the Secretary determined that a remote meeting was

needed and had members sign an official committee document electronically.[5] Committee staff

working at the direction of the Secretary as chair indicated that all official documents would be

signed electronically for the remainder of the summer.[6]

On June 19, 2020, the Secretary announced that meetings of the Financial Estimate

Committee scheduled for July 8, July 9, July 23, and even as far out as August 5, 2020 would not

allow in-person public testimony despite statutory public hearing requirements.[7]

**E. Numerous Courts in Other States Have Modified Election Requirements to Protect Political Rights in Light of COVID-19**

On March 25, 2020, a Virginia court granted a preliminary injunction reducing the

number of signatures needed to be a primary election candidate by 66%. The court found that

"the circumstances as they exist in the Commonwealth of Virginia and across the United

States are not normal right now," and that the signature threshold was not narrowly tailored

because it did "not provide for emergency circumstances, like those that currently exist."

*Faulkner v. Va. Dep't of Elections*, 104 Va. Cir. 373 (Va. Cir. Ct. Mar. 25, 2020).

On April 2, 2020, a Wisconsin federal court extended deadlines for requesting an

absentee ballot, for postmarking absentee ballots, and for absentee ballots to be received after

election, due to the undue burden on constitutional rights created by otherwise applicable

---

[5] Appointment of City, County, or District Representative to the Financial Estimate Committee, Financial Estimate Committee (Jun. 12, 2020),
https://sos.oregon.gov/elections/Documents/fec/Appoint-5th-member-signed.pdf.

[6] The Secretary of State's office said they are preparing IP57 for a possible financial estimate statement. Financial Estimate Committee, June 12, 2020 Meeting (Oregon State Legislature 2020), https://oregon.granicus.com/MediaPlayer.php?view_id=23&clip_id=28268 (at 15:02 to 15:37).

[7] Press Release, Secretary of State, Financial Estimate Committee (FEC) Meeting Schedule (Jun. 19, 2020), https://www.oregon.gov/newsroom/Pages/NewsDetail.aspx?newsid=36826.

statutory requirements in light of COVID-19. *Democratic National Comittee v. Bostelmann*, 451 F.Supp.3d 952, 982-983 (W.D. Wis. Apr. 2, 2020).

On April 17, 2020, Massachusetts' highest state court ordered a 50% reduction in the signature requirement to be a candidate and extended the deadlines for filing signatures. The court agreed that "these extraordinary times of a declared state of emergency arising from the COVID-19 pandemic create an undue burden on prospective candidate's constitutional right to seek elective office." *Goldstein v. Sec'y of Commonwealth*, 484 Mass. 516, 517 (Mass. 2020).

On April 20, 2020, a Michigan federal court granted a motion for preliminary injunction reducing the state signature requirement by 50% for a candidate to Michigan's Eleventh Congressional District and extending the submission deadline after finding that "the State's actions in the form of enforcing both the Stay-at-Home Order and the statutory ballot-access requirements operate in tandem to impose a severe burden." *Esshaki v. Whitmer*, 455 F.Supp.3d 367, 370 (E.D. Mich. Apr. 20, 2020). The court found that "state action"—Michigan's social distancing order—"pulled the rug out from under [candidates'] ability to collect signatures," "shuttered" the locations and events at which signatures are normally gathered, and left only "prohibitively expensive" means to obtain signatures. *Id.* at 377. Further, the court found that the option of running a mail-only petition campaign was not sufficient and created an unacceptable hurdle to ballot access. *Id.* at 376.

On April 23, an Illinois federal court granted a motion for preliminary injunction eliminating the signature requirements for candidates of existing third parties as well as reducing the signature requirement by 90% and extending the submission deadline for a candidate to qualify from a new party or as an independent. *Libertarian Party of Illinois v. Pritzker*, 455 F.Supp.3d 738, 745-746 (N.D. Ill. Apr. 23, 2020).

On May 5, 2020, the Sixth Circuit Court of Appeals upheld the *Esshaki* order enjoining the state from enforcing the signature threshold and submission deadline but stayed the specific remedy ordered by the district court. Instead, the Sixth Circuit ordered the state "to select its own adjustments so as to reduce the burden on ballot access, narrow the restrictions to align with its interest, and thereby render the application of the ballot access provisions constitutional under the circumstances." The Sixth Circuit noted that the district court's ordered remedy was not necessarily right or wrong, but rather that the state needed to have the first opportunity to attempt to remedy the constitutional violation before the court weighed in on whether the state's attempted remedy was sufficient. *Esshaki v. Whitmer*, 813 Fed.Appx. 170, 172-173 (6th Cir. May 5, 2020).

On May 8, 2020, Michigan adopted the three remedies originally ordered by the district court in *Esshaki*—including the 50% signature reduction and delayed deadline—but limited the availability of those remedies to candidates who had created candidate committees by March 10, 2020. On May 20, 2020, however, the district court enjoined the state's enforcement of the additional requirement to file a candidate committee by March 10 as overly burdensome. *Esshaki v. Whitmer*, 461 F.Supp.3d 646, 651 (E.D. Mich. May 20, 2020).

On May 29, 2020, a Nevada federal court granted a motion for preliminary injunction extending the deadline for initiatives to file signatures. The court held that it is "both unreasonable and unfair not to extend a statutory deadline for a corresponding period of time" as the six weeks Plaintiffs were effectively prohibited from collecting signatures by the Governor's Stay-at-Home orders. Despite the fact that the Secretary of State would be "severely inconvenienced" by extending the deadline, the court held that the normal deadline was "neither narrowly tailored, nor does it advance a compelling governmental interest under

the circumstance." *Fair Maps Nevada v. Cegavske*, 463 F.Supp.3d 1123, 1145-1147 (D. Nev. May 29, 2020).

On June 11, 2020, a Michigan federal court granted a motion for preliminary injunction and held that both the Michigan constitution's signature threshold and the statutory signature deadline for placing an initiative on the ballot were unconstitutional as-applied in light of the state's COVID-19-related orders. The court recognized that "there is nothing inherent in the [8%] signatures threshold that establishes that an initiative has a modicum of public support only if it has that many signatures." *SawariMedia LLC v. Whitmer*, 466 F.Supp.3d 758, 774 (E.D. Mich June 11, 2020). Notably, Michigan's constitutional signature threshold in Mich. Const., 1963, Art. 2, § 9 is nearly identical to Oregon's—8% "of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected"—and it was found unconstitutional as-applied in *SawariMedia*.

### III. STANDARD OF LAW

The Court may grant a temporary restraining order or preliminary injunction by finding one of two sets of criteria are satisfied. *Natural Res. Def. Council, Inc. v. Winter*, 518 F.3d 658, 677 (9th Cir. 2008). The "traditional" criteria consider four factors: (1) the likelihood of success on the merits, (2) the likelihood of irreparable harm in the absence of preliminary relief, (3) the balance of equities, and in some cases, (4) the public interest. *Id.*; *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24, 129 S. Ct. 365, 172 L.Ed.2d 249 (2008); *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1131, 1135-38 (9th Cir. 2011).

Ninth Circuit courts, among others, use a "sliding scale" to evaluate these equitable factors. A strong showing on one of the factors may offset a weak showing on another. *Cottrell*, 632 F.3d at 1131-32. Thus, for example, "a preliminary injunction is appropriate when plaintiff

demonstrates that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor."[8] *Id.* at 1134-35 (internal quotations and citations omitted).

Alternatively, a court may grant the request for a temporary restraining order if the plaintiff demonstrates either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised, and the balance of hardships tips sharply in the plaintiff's favor. *Natural Res. Def. Council, Inc.*, 518 F.3d at 677. To succeed under the "serious question" test, Plaintiffs must show that they are likely to suffer irreparable injury and that an injunction is in the public's interest. *Cottrell*, 632 F.3d at 1132. Plaintiffs satisfy both criteria, and this court should issue a Temporary Restraining Order for Plaintiffs' Putative Class.

## IV. ARGUMENT

### A. Plaintiffs Are Likely to Succeed on the Merits of Their State Constitutional Claims

To satisfy the "likelihood of success" element, the plaintiffs do not have to "prove [their] case in full" nor show that they are "more likely than not to prevail." Koller v. Brown, 224 F. Supp. 3d 871, 875 (N.D. Cal. 2016) (quoting Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)). Rather, a plaintiff must show only that the plaintiff has a "fair chance of success on the merits or raises questions serious enough to require litigation." Koller, 224 F. Supp. 3d at 875 (quoting Benda v. Grand Lodge of Int'l Ass'n. of Machinists & Aerospace Workers, 584 F.2d 308, 315 (9th.Cir. 1978)); see also All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011) ("This circuit has adopted and applied a version of the sliding scale approach under which a preliminary injunction could issue where the likelihood of success is such that

---

[8] The Supreme Court held in *Winter* that a preliminary injunction should not issue if a plaintiff shows only a possibility of harm rather than a likelihood of harm. *Winter*, 555 U.S. at 21; *see also* 632 F.3d at 1135.  However, it did not reject the sliding scale or "serious question" frameworks.  632 F.3d at 1132-34.

'serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor.'").

<u>1. Art. 2, § 18 of the Oregon Constitution Supports Plaintiff's Sought Relief</u>

The portions of Section 18 that address the applicable period of this recall reads:

> (1) Every public officer in Oregon is subject, as herein provided, to recall by the electors of the state or of the electoral district from which the public officer is elected.
>
> (2) Fifteen per cent, but not more, of the number of electors who voted for Governor in the officer's electoral district at the most recent election at which a candidate for Governor was elected to a full term, may be required to file their petition demanding the officer's recall by the people.

Or. Const. Art. 2, § 18.

Following these provisions, the Oregon Constitution provides no durational limitation, nor provision to refuse a petition from electors. Upon receipt of a recall petition, the City Clerk must then "determine whether it has sufficient *number* of signatures properly verified, and that signers are qualified legal voters, and if [they] deem[] it necessary check signatures with county clerk's registration." *State ex rel. Postlethwait v. Clark*, 143 Or. 482, 489 (Or. 1933), *citing* Or. Const. Art. 2, § 18 (emphasis added). Per the Oregon Constitution, the number of signatures gathered is the sole criterion on which petitions for recall should be judged.

Plaintiffs, as argued further below, will likely meet that numerical burden with additional time, and would have done so already had not the region been embroiled in a pandemic, labor shortage, and dangerous weather.

**B. Plaintiffs Are Likely to Succeed on the Merits of Their Federal Constitutional Claims**

The right to petition the government is at the core of First Amendment protections, which include the right of initiative. *City of Cuyahoga Falls Ohio v. Buckeye Cmty. Hope*

*Found.*, 538 U.S. 188, 196 (2003). As such, the circulation of recall petitions is "core political speech" where First Amendment protection is at its "zenith." *Meyer v. Grant*, 486 U.S. 414, 421-422, 425 (1988); *see also Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 128 (2011). While certain regulations of the recall process are valid, regulations that are overly burdensome to the recall process–let alone regulations that would make participation in the recall process effectively impossible–are met with strict scrutiny. *Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 197 (1999) (blocking requirement that petition circulators be registered voters).

In *Meyer*, for example, the United States Supreme Court overturned prohibitions on paid petition circulators. *Meyer*, 486 U.S. at 423. While recognizing that petitioners had "other avenues of expression" and that "the State has the authority to impose limitations on the scope of the state-created right to legislate by initiative," the Court determined that the "prohibition of paid petition circulators restricts access to the most effective, fundamental, and perhaps economical avenue of political discourse, direct one-on-one communication." *Id*. at 424 (emphasis added). Going further, the Court determined that leaving open "'more burdensome' avenues of communication, does not relieve its burden on First Amendment expression." *Id*. (citations omitted). Rather, the "First Amendment protects appellees' right not only to advocate their cause but also to select what they believe to be the most effective means for so doing." *Id*.

The Ninth Circuit has recognized that the analysis in *Meyer* is directly parallel to the type of situation in this case. The Ninth Circuit found two categories of restrictions on initiatives that create a "severe burden" triggering strict scrutiny: (1) "restrict[ing] one-on-one communication between petition circulators and voters" (2) "mak[ing] it less likely that proponents will be able to garner the signatures necessary to place an initiative on the ballot." *Angle v. Miller*, 673 F.3d 1122, 1132 (9th Cir. 2012).

<u>1. As applied during the Pandemic-related government restrictions on Plaintiffs, Oregon's signature-submission deadline restricts one-on-one communication between petition circulators and voters.</u>

In evaluating the first category of "severe burden," the Ninth Circuit considers whether a restriction "limits the number of voices who will convey the initiative proponents' message," or "discourages participation in the petition circulation process." *Id.* at 1132-33 (quoting *Buckley*, 525 U.S. at 194-95, 200). Oregon requires recall proponents to turn in signatures at least four months before the election, which is July 2, 2020 for this election. Oregon statute requires a recall petitioner to return the required number of signatures within 90 days of the filing of the prospective petition. ORS 249.875. There is no question that this deadline "restrict[s] one-on-one communication between petition circulators and voters" as it shortens the time period for such communication to occur. Further, it limits the overall number of voices that will be involved— for example, someone who only hears about the initiative after the deadline will never have the opportunity to convey the initiative's campaign message if the deadline prevents the initiative from qualifying. For the same reasons, it also discourages voters participating in the petition circulation process, especially where, as here, Pandemic-related restrictions on person-to-person contact are expected to be in place well past the deadline. Thus, the petition-submission deadline is subject to strict scrutiny.

<u>2. As applied during the Pandemic-related government restrictions on Plaintiffs, Oregon's signature threshold and signature-submission deadline both make it less likely that proponents will be able to garner the signatures necessary to place an initiative on the ballot.</u>

In evaluating the second category of "severe burden," the Ninth Circuit recognized that "ballot access restrictions place a severe burden on core political speech, and trigger strict scrutiny, when they significantly inhibit the ability of initiative proponents to place initiatives on the ballot"—thereby "limiting their ability to make the matter the focus of statewide

discussion." *Angle, supra*, 673 F.3d at 1132-33 (*quoting Meyer*, 486 U.S. 423). An initiative barrier will be subject to strict scrutiny if "(1) the proponents of the initiative have been 'reasonably diligent' as compared to other initiative proponents; and (2) when the restrictions significantly inhibit the proponents' ability to place an initiative on the ballot." *Fair Maps Nevada*, 463 F.Supp.3d at 1142 (D. Nev. May 29, 2020) (*quoting Angle*, 673 F.3d at 1132).

> **a. Plaintiffs' efforts to gather signatures under extraordinary circumstances have far exceeded reasonable diligence.**

Plaintiffs' efforts to collect signatures in the midst of a global pandemic and climate disaster easily meet the first *Angle* requirement for application of strict scrutiny to Oregon's ballot initiative signature requirements.

In *Fair Maps Nevada*, the federal court found reasonable diligence when petitioners pushed forward with organizing their campaign infrastructure during pre-circulation legal challenges, begin gathering signatures as soon as the main legal challenges were resolved, and continued working on their campaign infrastructure when COVID-19-related government orders effectively prevented circulation. This was despite the facts that petitioners (1) did not file their initiative until January 7, 2020; (2) had collected less than 11% of required signatures—only about 10,000 out of the 97,598 needed; (3) did not even attempt to collect any signatures after the Stay-at-Home order went into effect; and (4) had not presented any evidence about comparable initiative campaigns. *Id.* Since this fact pattern showed reasonable diligence, Plaintiffs in this case satisfy this requirement easily. *See also SawariMedia*, 466 F.Supp.3d 758, 772 (E.D. Mich June 11, 2020) (holding Plaintiffs showed "diligence" by collecting over 60% of required initiative signatures despite waiting to file until January 16, 2020).

Plaintiff maintained their concerted efforts to support signature gathering throughout the 90 day period allotted by statute, despite labor shortages, the pandemic, and calamitous weather.

Predominant among these issues, the Delta Variant of the COVID-19 virus plagued the recall effort by limited the amount of people who would be normally willing to engage with signature gatherers. Understandably, most people would be cautious to approach within 6 feet of a signature gatherer. Places frequented by petition signers, like MAX stations or shopping centers, were vacant. *Bourget Decl.*, ¶¶ 12-14, 22. The typical social faculties that facilitate signature gathering—smiling faces, shaking hands, prolonging contact through dialogue—were incompatible with the reality of a worsening pandemic. *Id.*, ¶ 31. The pandemic also directly put operation of the recall effort in jeopardy. Workers for the recall effort contracted COVID-19 or came into close contact with the disease. *Id.*, ¶ 20. This cause work stoppages from both sick time and from people leaving the campaign. *Id.*

COVID-19 contributed further to the recall effort's labor problem. Under non-pandemic circumstances, a recall effort like Plaintiff's could have expected to have hired five petition circulators collecting signatures at a rate of 14-20 per gatherer. *Bourget Decl.*, ¶ 9. Plaintiff "followed… normal processes and best practices" for running a petition-driven campaign, but Plaintiff could not maintain "more than two workers averaging 12 signatures per hour." *Bourget Decl.*, ¶ 11. The pandemic has created unusual strains on the labor market. Following mass layoffs in 2020, many laborers have remained on unemployment until they can find new, permanent employment. *Id.*, ¶ 19. Receiving unemployment benefits during the pendency of the pandemic has been arduous for many workers.[9] Petition-driven efforts could typically rely on some people requiring temporary employment. *Bourget Decl.*, ¶ 19. But now, taking temporary

---

[9] Mike Rogoway, *Gov. Kate Brown fires director of Oregon Employment Department over delays in delivering jobless benefits*, The Oregonian (May 31, 2020), available at https://www.oregonlive.com/business/2020/05/gov-kate-brown-fires-director-of-oregon-employment-department-over-delays-in-delivering-jobless-benefits.html

employment would disrupt needed unemployment benefits, making matters on the hiring-end difficult for filling temporary signature-gathering positions. *Id.*

Further compounding this, in the Summer of 2021 the Pacific Northwest faced unprecedented heat waves. While the most significant heat event occurred approximately two weeks before Plaintiff's petition was filed, its specter haunted the following weeks. The heatwave of June 2021 killed 96 people in Oregon.[10] July and August also saw record heat. *Bourget Decl.*, ¶ 23. When Plaintiff saw the coming heat wave of mid-August, for the good of their workers they did not hire nor send out canvassers for fear of putting them in further danger. *Id.* This caused further delay and hardship to their signature gathering effort.

Plaintiff had the funding, *Id.* at ¶ 37, and a popular mandate, *John Dec.* at ¶ 25, but not the labor. *Bourget Decl.*, ¶ 28. Regardless, Plaintiff has continued to collect signatures to this date.

As demonstrated above, Plaintiff has taken every effort necessary to successfully prosecute their recall campaign, but have been frustrated by an unrealistic signature gathering deadline.

### b. Oregon's signature threshold and signature-submission deadline both significantly inhibit Recall Ted Wheeler's ability to initiate a recall election.

Oregon's signature-gathering requirements—and Defendants' refusal to grant RTW relief from them—satisfy the second *Angle* requirement for strict scrutiny because they significantly inhibit RTW's ability to place the Initiative on the ballot. Courts assess regulations and restrictions on the right to vote and to engage in political expression under the sliding-scale standards established by *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi,*

---

[10] Amelia Templeton and Monica Samayoa, *Oregon medical examiner releases names of June heat wave victims*, Oregon Public Broadcasting (Aug. 6, 2021), available at https://www.opb.org/article/2021/08/06/oregon-june-heat-wave-deaths-names-revealed-medical-examiner/

504 U.S. 428 (1992). If a severe burden on these rights is established, then strict scrutiny

applies. *See, e.g.*, *Harper v. Virginia State Board of Elections*, 383 U.S. 663 (1966).

The Supreme Court has identified ways in which regulations on the initiative process

may burden "core political speech." *Meyer*, 486 U.S. at 422. Regulations may make it less likely

that proponents will be able to gather the necessary signatures to get their initiative on the ballot,

"thus limiting their ability to make the matter the focus of statewide discussion." *Id.* at 423. In

*Meyer*, the unconstitutional restriction was a ban on paid signature gathering, which is the most

efficient subset of in-person petitioning. *Id.* at 424. Such ballot initiative regulations trigger

strict scrutiny when they "significantly inhibit the ability of initiative proponents to place

initiatives on the ballot." *Angle*, 673 F.3d at 1133.

Here, the analysis is very simple. RTW cannot qualify a recall election with the current

signature threshold, requirement for wet signatures, and submission deadline. This factor is met,

and strict scrutiny is triggered for all three requirements.

Oregon's recall petition signature requirements pose such a significant burden to RTW's

efforts because the requirements have failed to account for the Pandemic's wave of

unprecedented public restrictions. Governor Brown's Stay Home, Save Lives order, the banning

of public gatherings of larger than 25 people, and six-feet social distancing requirements have

severely limited the one-on-one communication between the plaintiffs, petition circulators, and

voters. They preclude the traditional approach to signature-gathering, where circulators engage

voters in the public arena and highly-trafficked areas, including markets or public-transportation

nexuses, which are the type of quintessential public forums where First Amendment Protections

are at their highest. *See, e.g., Perry Educ. Ass'n v. Perry Educators' Ass'n,* 460 U.S. 37, 45

(1983). These in-person interactions, in public spaces less than six feet apart with strangers, are

at the core of traditional signature-gathering practices and were integral parts of the elections used to set the current signature requirement figures. As recognized by the court in *Fair Maps Nevada,* the Pandemic-related state restrictions create the factual circumstances under which the signature threshold and submission deadline requirements are severely burdensome.

The Pandemic-related orders prevent high-efficiency, in-person *paid* circulators—a prohibition that the United States Supreme Court found was unconstitutional in *Meyer*. However, the Pandemic-related orders also go even further than the unconstitutional prohibition in *Meyer* by also restricting in-person *volunteer* circulators. Now, although the Pandemic has completely stymied fundamental signature-gathering practices, Defendants have not adjusted the signature requirements accordingly.

The arbitrary submission deadline for the petition and the high signature threshold in light of the Pandemic and the subsequent restrictions on movement made it practically impossible for the proponents to gather the necessary signatures to qualify for a recall election. With the significant restriction on collecting signatures due to social distancing measures, historic weather events, and labor shortages Plaintiff RTW was unable to gather the required number of signatures to meet the signature threshold and submission deadline. If relief is not granted by this court this will preclude Plaintiffs from initating a recall of a profoundly unpopular elected official and places a severe burden on the Plaintiffs' core political speech. As the court recognized in *Fair Maps Nevada*, this satisfies the second prong of the *Angle* test and triggers strict scrutiny.

///

///

///

MOTION FOR TEMPORARY RESTRAINING ORDER
Page 26 of 32

3. Oregon's signature threshold and signature-submission deadline both fail strict scrutiny as-applied during the Pandemic-related government restrictions on RTW.

In order to survive strict scrutiny, Defendants' signature requirements must be narrowly tailored to further a compelling government interest. *Prete v. Bradbury*, 438 F.3d 949, 961-62 (9th Cir. 2006). Defendants' regulations fail that test.

The present combination of restrictions is even more burdensome than the restriction on *paid* circulators that the Supreme Court held unconstitutional in *Meyer*. The Pandemic-related orders restricting both *paid* and *volunteer* in-person circulation, in combination with the artificial signature thresholds and turn-in deadlines, create an overall regulation scheme that is unconstitutional as-applied to RTW in this unique situation.

**c. Defendants' arbitrary 47,788 signature threshold cannot survive strict scrutiny in these unique circumstances**

The signature threshold requirement to place an initiative on the ballot is not narrowly tailored given the challenges faced by RTW to collect signatures during the Pandemic-related orders. RTW recognizes Defendants' interest in conducting an orderly election process and ensuring reasonable citywide support before initiating a recall election. But imposing a pre-Pandemic numerical signature requirement provides no flexibility for accurately or reliably determining sufficient support for a ballot initiative when the in-person gathering of signatures is impossible. The threshold thus is not narrowly tailored to achieve the governmental interest of properly measuring support for recall elections and qualifying them in a fair and objective process.

One of the key principles of fair elections is not changing the rules in the middle of the game—but this is exactly what the state did to PNP in a uniquely harmful way in this case by

banning in-person signature gathering during the very period when PNP had long been planning to conduct in-person signature gathering.

Other courts have agreed that initiative requirements–including minimum signature requirements–fail strict scrutiny and must be adjusted in response to the COVID-19 pandemic-related orders. In *SawariMedia* the court held that the state's compelling interest to ensure that an initiative has enough verified support can still be achieved by requiring a lesser number of signatures than what would be required absent a global pandemic. That case dealt with Michigan's constitutional threshold of 8% of votes in the last governor's election—about half of the percentage required by the Defendants. The *SawariMedia* court recognized that "there is nothing inherent in the [8%] signatures threshold that establishes that an initiative has a modicum of public support only if it has that many signatures." 466 F.Supp.3d 758, 774 (E.D. Mich June 11, 2020).

Likewise, in *Esshaki*, the court found that the signature threshold for candidates did not survive strict scrutiny even when the option of running a mail-only petition campaign was available. *Esshaki v. Whitmer*, 455 F.Supp.3d 367, 370-371 (E.D. Mich. 2020). The Sixth Circuit affirmed the *Esshaki* analysis that the signature threshold did not survive strict scrutiny. *Esshaki v. Whitmer*, Fed.Appx. 170, 172-173 (6th Cir. May 5, 2020).

Other cases have reached similar conclusions when enjoining signature thresholds. *Libertarian Party of Illinois,* 455 F.Supp.3d at 745-746; *Goldstein,* 484 Mass at 517; *Faulkner v. Va. Dep't of Elections*, 104 Va. Cir. 373 (Va. Cir. Ct. Mar. 25, 2020) (the signature threshold was not narrowly tailored because it did "not provide for emergency circumstances, like those that currently exist.").

Defendants' signature threshold for a recall petition is 15% of the votes cast at the last governor's election for a full term—47,788 signatures in 2020, the absolute maximum allowed by the Oregon Constitution. Or. Const., Art. II, § 18(2). At the outset, this is a rather arbitrary threshold. It is not the number itself that is the government interest but rather what it represents—a reasonable estimate for what is needed to determine sufficient support. In 2021, the 15% threshold is uniquely disconnected from historical standards of demonstrating sufficient support due to more than just Pandemic-related restrictions.

### d. Defendants' submission deadline cannot survive strict scrutiny in these unique circumstances.

Defendants have ample means to conduct an orderly election process even if the signature submission deadline were delayed.

In *Fair Maps Nevada*, the court found that the existing deadline for petition submission to qualify an initiative for the ballot was not narrowly tailored to serve a compelling governmental interest because the defendants could still accomplish what they normally do to verify the collected signatures to then prepare the initiative for the ballot with less restrictive means. The court held that it is "both unreasonable and unfair not to extend a statutory deadline for a corresponding period of time" as the six weeks Plaintiffs were effectively prohibited from collecting signatures by the Governor's Stay-at-Home orders. *Fair Maps Nevada,* 463 F.Supp.3d at 1146. While recognizing that extending the deadline for submitting signatures could create a burden on the Secretary for verification, that burden did not outweigh the right to ballot access. *Id.* at 1147 ("Thus, the Court does not find severe inconvenience a compelling government interest given these extraordinary circumstances").

Likewise, in *Esshaki*, the court found that the signature deadline for candidates did not survive strict scrutiny even when the option of running a mail-only petition campaign. *Esshaki v.*

*Whitmer*, 455 F.Supp.3d 367, 370-371 (E.D. Mich. 2020). The Sixth Circuit affirmed the *Esshaki* analysis that the signature deadline did not survive strict scrutiny. *Esshaki v. Whitmer*, Fed.Appx. 170, 172-173 (6th Cir. May 5, 2020).

Other courts have reached a similar conclusion. *SawariMedia,* 466 F.Supp.3d 758, 762 (E.D. Mich June 11, 2020) (extending initiative signature deadline); *Goldstein,* 484 Mass at 517 (extending deadline for filing candidate signatures). Because a recall is its own ballot and is conducted as a special election outside of the normal election calendar, the only natural deadline for initiating a recall is the end of an official's term. Defendants would suffer no inconvenience or accelerated timeline for validating signatures if the deadline were extended by this Court.

**C. Plaintiffs Will Suffer Irreparable Harm Without an Injunction**

The Recall Ted Wheeler recall petition popular and has prompted substantial contributions and volunteer efforts from a wide swath of Portland voters. Without a change to the electronic signature rules and arbitrary timelines, it is unlikely that another effort would be even as successful as RTW due to fatigue and a feeling of disenfranchisement from those who have participated in the present effort. This means that Plaintiffs' will be deprived of their right to recall their elected officials under the Oregon Constitution and silenced in their core political speech.

**D. The Balance of Equities Sharply Favors Plaintiffs**

Enforcement of signature-gathering requirements that do not account for extraordinary public health restrictions effectively bar plaintiffs from gathering signatures to place a recall of Ted Wheeler before the voters. This causes unique harm to Plaintiffs, because without a recall election the voters will have no chance to remove an unpopular official from office before the 2024 election.

The primary harm to the Defendant of eliminating the 90-day deadline for collecting signatures, some uncertainty as to when they will be called upon to certify signatures, is minimal when weighed against a *de facto* prohibition preventing the plaintiffs from exercising a fundamental right enshrined in the Oregon Constitution. Removing this deadline would not affect the amount of time Defendants would have to make their certification and any burden on Defendants is trivial.

Reducing the signature threshold would also not increase Defendants' administrative burden. Oregon law requires a statistical sampling of at least five percent of signatures submitted to determine the validity of those signatures. ORS 250.105(5). Reducing the required number of signatures Plaintiffs must submit would also reduce the number of signatures Defendant must verify.

From a practical perspective, the only "harm" to Defendants is that they would have to fulfill their function of holding a recall election and the question of whether Ted Wheeler should be recalled would go to the voters. More speech is good.

**E. An Injunction Would Serve the Public Interest**

In the absence of action by the Court, the Plaintiffs' constitutional rights will be abridged. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). This is particularly true for First Amendment freedoms. Indeed, the harm here will not only be felt by the Plaintiffs. Should they fail to succeed, the integrity of Oregon's political system will be harmed to the detriment of all Oregonians. Because Oregon's interest in public support and signature integrity can be accomplished through less restrictive means, there is no reason not to grant the requested relief. *See Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) ("[T]he loss of First

Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976))); *Warsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir. 2005) (recognizing that a "colorable First Amendment claim" is "irreparable injury sufficient to merit the grant of relief").

This Court would not be alone in finding that the public interest is served by enjoining the current requirements to place an initiative on the ballot; in response to the COVID-19 pandemic, courts across the nation have recognized that these requirements must be adjusted in order to preserve citizens' constitutional rights. *See, e.g., SawariMedia,* 466 F.Supp.3d 758, 762 (E.D. Mich June 11, 2020) (lowering the number of signatures required and the submission deadline in order to place an initiative on the Michigan ballot); *Fair Maps Nev.,* 463 F.Supp.3d at 1145-1147 (D. Nev. May 29, 2020) (extending the deadline to submit signatures to place an initiative on the ballot). Because the requested injunction will preserve the state's ability to run an orderly election process while also preserving the constitutional rights of the Plaintiffs, the public interest also favors an order protecting Plaintiffs.

## V. CONCLUSION

Plaintiffs respectfully request that this Court grant their request for a temporary restraining order to remove or modify Recall Ted Wheeler's deadline for submitting signatures, to order Defendants to accept digital and/or electronic signatures, and to reduce the number of signatures required to be submitted.

DATED: October 20, 2021

Respectfully Submitted,

/s/ *Juan C. Chavez*                          /s/ *Alan Lloyd Kessler*
Juan C. Chavez, OSB #136428          Alan Lloyd Kessler, OSB #150209
PO Box 5248                                    1001 SE Sandy Blvd Ste. 210
Portland, OR 97208                           Portland, OR 97214

MOTION FOR TEMPORARY RESTRAINING ORDER
Page 32 of 32