NAOMI SHEFFIELD, OSB 170601
Sr. Deputy City Attorney
naomi.sheffield@portlandoregon.gov
DENIS VANNIER, OSB No. 044406
Sr. Deputy City Attorney
denis.vannier@portlandoregon.gov
Portland City Attorney's Office
1221 SW 4th Ave., Rm. 430
Portland, OR 97204
Telephone: (503) 823-4047
Facsimile: (503) 823-3089
*Of Attorneys for Defendants Mary Hull Caballero
and Louise Hansen*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **RECALL TED WHEELER, JOHN SCHROEDER, and MADELINE KAY,**<br><br>**PLAINTIFFS,**<br><br>v.<br><br>**MARY HULL CABALLERO, Portland City Auditor, and LOUISE HANSEN, Elections Officer,**<br><br>**DEFENDANTS.** | Case No. **3:21-cv-01448-MO**<br><br>**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER** |

Page i –  DEFENDANTS RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR
 TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................1

II.    BACKGROUND ..................................................................................................1

    A.    Oregon Recall Law and Procedures ........................................................1

    B.    Plaintiffs' Prospective Petition for Recall Election ................................2

    C.    Public Gatherings Were Not Restricted During RTW's Signature Gathering Period, and the Outdoor Mask Mandate Was Imposed 50 Days into the Signature Gathering Period ................................................................4

    D.    The Northwest's Historic Heat Wave Ended Nine Days Before Plaintiffs Began Gathering Signatures, and the Heat Wave Did Not Recur.......................4

III.    ARGUMENT ........................................................................................................5

    A.    Applicable Legal Standard ........................................................................5

    B.    Plaintiffs Seek a Mandatory TRO and Are Therefore Subject to a "Doubly Demanding" Burden of Proof and Persuasion ........................................7

    C.    Plaintiffs Have Not Demonstrated That They Are Likely to Suffer Irreparable Harm ........................................................................................................8

    D.    Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims.......................10

        **1.**    **Plaintiffs' federal claims are without merit.**...........................................10

        **2.**    **Plaintiffs' claims are barred by the Eleventh Amendment because they seek retrospective relief against public officials who performed duties imposed by state law.**................................................................20

        **3.**    **This court does not have jurisdiction over Plaintiffs' state-law claim.**................................................................................................21

        **4.**    **Plaintiffs have not shown a likelihood of success on their state law claim.**................................................................................................22

    E.    Plaintiffs Have Not Established That the Balance of Equities Weigh in Their Favor or That a Temporary Restraining Order Is in the Public Interest ...............23

PORTLAND CITY ATTORNEY'S OFFICE
1221 SW 4TH AVENUE, RM 430
PORTLAND, OREGON 97204
TELEPHONE: (503) 823-4047
FAX: (503) 823-3089

## TABLE OF AUTHORITIES

Federal Cases

486 U.S., 525 U.S. ................................................................................... 15

701 Fed. App'x 579 (9th Cir. 2017) ........................................................ 22

*Alliance for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) .............................................................. 6

*Andino v. Middleton*,
   141 S. Ct. 9 (2020)................................................................................ 18

*Angle v. Miller*,
   673 F.3d 1122 (9th Cir. 2012) .................................................... passim

*ante*............................................................................................................ 6

*Barnett v. BAC Home Loan Servicing, L.P.*,
   772 F. Supp. 2d 1328 (D. Or. 2011) .................................................... 6

*Buckley v. Am. Constitutional Law Found.*,
   525 U.S. 182, (1997)............................................................................ 11

*Burdick v. Takushi*,
   504 U.S. 428 (1992).............................................................................. 24

*Caribbean Marine Servs. Co. v. Baldridge*,
   844 F.2d 668 (9th Cir. 1998) ........................................................... 7, 9

*Carter v. City of Philadelphia*,
   181 F.3d 339 (3d Cir. 1999).................................................................. 20

*Chalk v. U.S. Dist. Court*,
   840 F.2d 701 (9th Cir. 1988) ................................................................ 6

*Clarno v. People Not Politicians Oregon*,
   141 S. Ct. 206 (2020).............................................................. 12, 13, 16

*Democratic National Committee v. Bostelmann*,
   451 F. Supp. 3d 952 (W.D. Wis. 2020) ............................................... 16

*Fair Maps Nevada v. Cegavske*,
   463 F. Supp. 3d 1123 (D. Nev. May 29, 2020)............................ 13, 16

*Fight for Nev. v. Cegavske*,
   460 F. Supp. 3d 1049 (D. Nev. 2020).................................................. 14

*Ford Motor Co. v. Department of Treasury*,
   323 U.S. 459 (1945).............................................................................. 21

*Garcia v. Google, Inc.*,
   786 F.3d 733 (9th Cir. 2015) ........................................................... 6, 8

*Gish v. Newsom*,
   2020 WL 1979970 (C.D. Cal. Apr. 23, 2020) ...................................... 9

*Granny Goose Foods, Inc. v. Teamsters*,
   415 U.S. 423 (1974).............................................................................. 5

*Green v. Mansour*,
   474 U.S. .................................................................................................. 20

*Hale v. State of Ariz.*,

967 F.2d 1356 (9th Cir. 1992) ........................................................................ 21, 22

*Heckler v. Lopez,*
463 U.S. 1328 (1983) ........................................................................................ 6

*Hodgers-Durgin v. Gustavo De La Vino,*
199 F.3d 1037 (9th Cir. 1999) ......................................................................... 8

*Klein v. City of San Clemente,*
584 F.3d 1196 (9th Cir. 2009) ......................................................................... 7

*Little v. Reclaim Idaho,*
140 S. Ct. 2616 (2020) ................................................................. 12, 13, 16, 18

*Los Angeles Unified Sch. Dist. v. United States Dist. Court for the Cent. Dist. of Cal.,*
650 F.2d 1004 (9th Cir. 1981) ......................................................................... 5

*Marijuana Policy Project v. United States,*
304 F.3d 82 (D.C. Cir. 2002) ......................................................................... 13

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,*
571 F.3d 873 (9th Cir. 2009) ................................................................... 6, 7, 8

*Mazurek v. Armstrong,*
520 U.S. 968 (1997) ..................................................................................... 5, 7

*Merrill v. People First of Alabama,*
141 S. Ct. 190 (2020) ..................................................................................... 18

*Meyer v. Grant,*
486 U.S. 414 (1988) ....................................................................................... 11

*Mi Familia Vota v. Hobbs,*
977 F.3d 948 ................................................................................................... 18

*Miller v. Thurston,*
967 F.3d 727 (8th Cir. 2020) ......................................................................... 16

*Molinari v. Bloomberg,*
564 F.3d 587 (2d Cir. 2009) ........................................................................... 13

*Nader v. Brewer,*
531 F.3d 1028 (9th Cir. 2008) ....................................................................... 15

*Oakland Trib., Inc. v. Chron. Pub. Co.,*
762 F.2d 1374 (9th Cir. 1985) ....................................................................... 10

*Pennhurst State Sch. & Hosp. v. Halderman,*
465 U.S. 89 (1984) ................................................................................... 21, 22

*People Not Politicians Oregon v. Clarno,*
826 F. App'x 581 (9th Cir. 2020) ................................................................... 12

*Pohlman v. Hormann,*
2014 WL 5425502 ............................................................................................ 5

*Porter v. Jones,*
319 F.3d 483 (9th Cir. 2003) ......................................................................... 21

*Purcell ex rel. Estate of Morgan v. Toombs County, Ga,*
400 F.3d 1313 (11th Cir. 2005) ..................................................................... 20

*SawariMedia LLC v. Whitmer,*
466 F. Supp. 3d 758 (E.D. Mich. 2020) ........................................................ 17

*Simula, Inc. v. Autoliv, Inc.*,
  175 F.3d 716 (9th Cir. 1999) ................................................................................. 9
*Storer v. Brown*,
  415 U.S. 724 (1974) ............................................................................................. 24
*Thompson v. DeWine*,
  976 F.3d 610 (6th Cir. 2020) (reversing ............................................................. 16
*Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*,
  535 U.S. 635 (2002) ............................................................................................. 20
*Weiner v. San Diego Cty.*,
  210 F.3d 1025 (9th Cir. 2000) ............................................................................. 22
*Winter v. Natural Res. Def. Council*,
  555 U.S. 7 (2008) ........................................................................................ 6, 7, 23

State Cases

*Comm. to Recall Robert Menendez From the Off. of U.S. Senator v. Wells*,
  7 A.3d 720 (N.J. 2010) ........................................................................................ 13
*Faulkner v. Va. Dep't of Elections*,
  104 Va. Cir. 373 (Va. Cir. Ct. Mar. 25, 2020) ................................................... 16
*Goldstein v. Sec'y of Commonwealth*,
  484 Mass. 516 (2020) .......................................................................................... 17

State Statutes

Article II, Section 18 of the Oregon Constitution ....................................................... 1, 2
Or. Const. Art. II, § 18(8) ................................................................................................. 2
Or. Const. Art. II, Section 18(7) ..................................................................................... 10
ORS 249.009 .................................................................................................................. 20
ORS 249.865 .................................................................................................................... 2
ORS 249.870 .............................................................................................................. 3, 20
ORS 249.875 ............................................................................................. 3, 10, 20, 23
ORS 249.875(1) ...................................................................................... 2, 22, 23

Federal Rules

Fed. R. Civ. Pro. 5.1 ......................................................................................................... 4

State Regulations

OAR 333-019-1025 ........................................................................................................... 4

## I.    INTRODUCTION

Having failed to accomplish their goal of obtaining the signatures necessary to trigger a recall of Mayor Ted Wheeler, Plaintiffs ask this court for an unspecified rewrite of Oregon law to allow them to nonetheless proceed with a recall election. The Court should decline Plaintiffs' invitation to intervene in the Defendants' proper application of election laws and processes, as none of the four factors for a temporary restraining order weigh in Plaintiffs' favor.

First, and dispositively, Plaintiffs demonstrate no imminent, irreparable harm. Plaintiffs' request for emergency relief comes well past the operative deadline for obtaining signatures, demonstrating this lack of urgency. Moreover, Plaintiffs are not being harmed by any action by Defendants related to the signature gathering threshold or deadline. Second, Plaintiffs have not demonstrated a likelihood of success on either their First Amendment or Oregon Constitutional claims. With respect to the First Amendment, the Supreme Court just last year stayed an injunction like the one requested by Plaintiffs, and based on pandemic restrictions and circumstances that were far more burdensome than those evidenced by Plaintiffs in this motion. Plaintiffs' novel Oregon Constitutional claim is presented with limited argument, but similarly fails to consider the entirety of Article II, Section 18 in presenting their argument. Third, the balance of equities weighs against Plaintiffs, who are not prohibited from submitting a new prospective petition to recall Mayor Wheeler, and in favor of Defendants' attempt to support and adhere to the orderly administration of democratic election processes. Finally, the public interest in the fair, even-handed, and predictable enforcement of election laws weighs against Plaintiffs' motion. For these reasons, as further discussed below, the Court should deny Plaintiffs' motion for a temporary restraining order.

## II.    BACKGROUND

### A.  Oregon Recall Law and Procedures

Article II, Section 18 of the Oregon Constitution provides:

Page 1 - DEFENDANTS RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

> (1) Every public officer in Oregon is subject, as herein provided, to recall by the electors of the state or of the electoral district from which the public officer is elected.
>
> (2) Fifteen per cent, but not more, of the number of electors who voted for Governor in the officer's electoral district at the most recent election at which a candidate for Governor was elected to a full term, may be required to file their petition demanding the officer's recall by the people.

Or. Const. Art. II, §18. It further empowers the legislature to enact "[s]uch additional legislation as may aid the operation of this section[.]" Or. Const. Art. II, § 18(8). In compliance with this direction to enact relevant legislation, Oregon law provides:

> A recall petition shall be void unless completed and filed not later than the 100th day after filing the prospective petition described in ORS 249.865. Not later than the 90th day after filing the prospective petition the petition shall be submitted to the filing officer who shall verify the signatures not later than the 10th day after the submission. The filed petition shall contain only original signatures. A recall petition shall not be accepted for signature verification if it contains less than 100 percent of the required number of signatures. The petition shall not be accepted for filing until 100 percent of the required number of signatures of electors have been verified.

ORS 249.875(1).

### B. Plaintiffs' Prospective Petition for Recall Election

Chief Petitioner, Melissa Blount[1] filed a prospective petition with the Auditor's Office on July 8, 2021. (Declaration of Louise Hansen ("Hansen Decl."), ¶ 2). The next day, on July 9, 2021, the Auditor's Office accepted the prospective petition, and issued an approved signature

---

[1] Plaintiffs appear to conflate the Recall Ted Wheeler ("RTW") petition committee with the Total Recall PAC political action committee. For example, the Declaration of Greg Bourget at paragraph 37 states that, "RTW [Recall Ted Wheeler] gathered donations in excess of $147,000 from donors." Further, paragraph 10 of the Complaint states that, "RTW [Recall Ted Wheeler] is responsible for circulating the petition for signatures and otherwise qualifying for a recall election." However, according to the Oregon Secretary of State's campaign finance website, Recall Ted Wheeler has only raised a total of $4,250. Meanwhile, according to the Secretary of State's website, Total Recall PAC has raised over $145,000 in 2021, the reported expenditures appear to be funding signature gathering efforts, and one of Plaintiffs' counsel is listed as a director of the Total Recall PAC.

Page 2 - DEFENDANTS RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

sheet. (*Id.* at 4). Consistent with the requirements of the Oregon Constitution and ORS 249.870, the Auditor's Office set the threshold of verified signatures to trigger a recall election at 47,788 and informed the Chief Petitioner of that threshold. (*Id.* at ¶¶ 5-7). Moreover, consistent with the requirements set forth in ORS 249.875, the Auditor's Office set a deadline of October 6, 2021 to submit the petition with completed signature. (*Id.*)

On September 22, 2021, Seth Woolley, acting as an authorized agent for Melissa Blount and treasurer of the Recall Ted Wheeler ("RTW") campaign committee, emailed the Auditor's Office requesting a 90-day extension to collect signatures due to "the Delta variant," "the historic heatwave in July depriving the campaign of two weeks of productive signature gathering," and the Governor's reimposition of masking or social distancing requirements at the end of August 2021. (ECF 6, at 12). Defendant Hansen, the City Elections Officer, denied the request for an extension, which would have required waiving the requirements of state law. (*Id.* at 13-14). In her response, the City Elections Officer noted that the signature gathering period began after Portland's historic heatwave in the end of June. (*Id.* at 13-14). The Elections Officer also noted that public gatherings were not restricted during the course of signature gathering, and the outdoor mask mandate—imposed 50 days into the signature gathering period[2]—did not require social distancing for people wearing masks. (*Id.* at 13-14).

On October 4, 2021, Plaintiffs filed their Complaint in this case. The October 6, 2021 deadline for gathering signatures came and went, and no recall petition was submitted to the Auditor's Office. (Hansen Decl., ¶ 10). The Auditor has not received any signatures related to Melissa Blount's prospective recall petition. (*Id.*). On October 20, 2021, two weeks after the October 6th deadline and over two weeks after filing their Complaint, Plaintiffs filed their motion seeking a temporary restraining order and requesting an expedited hearing. Plaintiffs

---

[2] The City Elections Officer's denial correctly states the outdoor mask mandate was imposed on August 27, 2021, but incorrectly states that date is 56 days into the signature gathering period. The mandate was imposed 50 days into the signature gathering period.

never served the Auditor or the City Elections Officer with the Complaint. Plaintiffs, challenging the constitutionality of an Oregon statute, have not indicated that they have properly served the Attorney General of the State of Oregon pursuant to Federal Rule of Civil Procedure 5.1.

**C. Public Gatherings Were Not Restricted During RTW's Signature Gathering Period, and the Outdoor Mask Mandate Was Imposed 50 Days into the Signature Gathering Period**

The time at issue before the Court is RTW's 90-day signature gathering period, beginning on July 8, 2021 and ending on October 6, 2021. Most pandemic restrictions identified by Plaintiffs were removed well before RTW began gathering signatures. In fact, as more people received vaccines during the late spring and early summer, Governor Brown lifted almost all pandemic restrictions on June 25, 2021, including mandatory masks and social distancing. (Executive Order No. 21-15). Restaurants were open for indoor and outdoor dining at full capacity. And significantly, most of the City's top attractions were open including the Oregon Museum of Science and Industry, Powell's City of Books, the Portland Saturday Market and Portland's farmers markets. In other words, when RTW's signature gathering period began on July 8, the City was transitioning to a sense of normalcy.

Governor Brown re-instated an indoor mask requirement on August 13, 2021, and an outdoor mask requirement where physical distancing is not possible on August 27 to help slow the spread of the Delta variant (OAR 333-019-1025 (Masking Requirements for Indoor and Outdoor Spaces)). No other pandemic restrictions were imposed during the second half of RTW's signature gathering period. Accordingly, RTW was free to gather signatures without pandemic-related restrictions during the first half of the signature-gathering period and an outdoor mask mandate was imposed 50 days into the signature gathering period.

**D. The Northwest's Historic Heat Wave Ended Nine Days Before Plaintiffs Began Gathering Signatures, and the Heat Wave Did Not Recur**

Plaintiffs' reliance on the Northwest's historic heat wave as a cause for their deficient signature gathering is misplaced. The June heat wave—with temperatures reaching an unprecedented 116 degrees—ended on June 28, 2021. Plaintiffs filed their prospective petition ten days later, on July 8, 2021, when temperatures had returned to seasonal averages. The June heat wave had no impact on Plaintiffs' signature gathering.

Because the June heat wave led to fatalities within the City, Mayor Wheeler declared a state of emergency in July and again in August after the National Weather Service forecast temperatures expected to rise to 100 degrees. (In the Matter of the Local Emergency Within the City of Portland Declared for July 30-31, 2021; In the Matter of the Local Emergency Within the City of Portland Declared for August 11-15, 2021). However, only two of the seven days covered by the proactive emergency declarations rose to 100 degrees (August 11 and 12 were each 102 degrees)[3]. Accordingly, only two days out of Plaintiffs' ninety-day signature gathering period recorded excessive temperatures.

## III.    ARGUMENT

### A. Applicable Legal Standard

A temporary restraining order ("TRO") is an "extraordinary and drastic remedy." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). A temporary restraining order "should be restricted to serving [its] underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 438-39 (1974).

"[T]he standards for issuance of a temporary restraining order are at least as exacting as those for a preliminary injunction." *Pohlman v. Hormann*, 2014 WL 5425502, *1 n. 1 (D. Or. Oct. 20, 2014) (citing *Los Angeles Unified Sch. Dist. v. United States Dist. Court for the Cent. Dist. of Cal.*, 650 F.2d 1004, 1008 (9th Cir. 1981)). A preliminary injunction is "an extraordinary

---

[3] https://projects.oregonlive.com/weather/temps/.

remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Barnett v. BAC Home Loan Servicing, L.P.*, 772 F. Supp. 2d 1328, 1333 (D. Or. 2011) (quoting *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008)). The Supreme Court established in *Winter* that "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." 555 U.S. at 20. Alternatively, a preliminary injunction is available where there are "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff[s]," but only if Plaintiffs also "show[] that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

That already high standard is further heightened when—as here—the type of injunction sought is a "mandatory injunction." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (noting that the burden is "doubly demanding" for a mandatory injunction). A mandatory injunction is one that requires a party to take action, as opposed to merely preserving the status quo, and is "particularly disfavored":

> A preliminary injunction can take two forms. A prohibitory injunction prohibits a party from taking action and "preserve[s] the status quo pending a determination of the action on the merits." *Chalk v. U.S. Dist. Court*, 840 F.2d 701, 704 (9th Cir. 1988); *see also Heckler v. Lopez*, 463 U.S. 1328, 1333 (1983) (a prohibitory injunction "freezes the positions of the parties until the court can hear the case on the merits"). A mandatory injunction orders a responsible party to take action. A mandatory injunction goes well beyond simply maintaining the status quo [p]endente lite [and] is particularly disfavored. In general, mandatory injunctions are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages. The *status quo ante litem* referenced in *Chalk* means the last, uncontested status which preceded the pending controversy.

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878-79 (9th Cir. 2009) (quotation marks and citation omitted) (alterations in original). To obtain a mandatory

injunction, a plaintiff must "establish that the law and facts *clearly favor* her position, not simply that she is likely to succeed." *Id.* (emphasis in original).

Regardless of the injunction—prohibitory or mandatory—courts also "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (internal citations omitted). Plaintiffs bear the burden of proving each of the elements. *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009); *see also Caribbean Marine Servs. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1998) ("A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief."). The requirement for a plaintiff on a motion for preliminary injunctive relief "for substantial proof is much higher" than even what is required in connection with summary judgment. *Mazurek*, 520 U.S. at 972.

### B. Plaintiffs Seek a Mandatory TRO and Are Therefore Subject to a "Doubly Demanding" Burden of Proof and Persuasion

Here, Plaintiffs seek mandatory relief—that is, relief that goes "beyond simply maintaining the status quo" pending litigation. *Marlyn Nutraceuticals*, 571 F.3d at 878-79. The status quo in this case is that Plaintiffs missed the October 6, 2021 deadline for submitting the 47,788 verified signatures necessary for their recall petition to trigger a special election. Indeed, that deadline came and went without Plaintiffs submitting *any* signatures to the Auditor's Office. (Hansen Decl., ¶ 10). And that deadline came and went without Plaintiffs asking this court for any kind of preliminary relief. (*See* Docket). This is so despite Plaintiffs having had prior notice of the deadline to qualify for the ballot and its related signature requirements months before. (*See* Declaration of John Schroeder, ECF 6, at 2-3). Plaintiffs do not wish to maintain that status quo—quite the contrary.

Rather, more than two weeks after the fact, Plaintiffs now ask this court to issue a TRO

ordering Defendants to change their election procedures, to retroactively extend a deadline that has already lapsed, and to accept an unspecified number and unspecified types of signatures as retroactively triggering the requirements for a special recall election. (*See* Motion for TRO at 32) (asking this court to order defendants to "remove or modify [the] deadline for submitting signatures, to order Defendants to accept digital and/or electronic signatures, and to reduce the number of signatures required to be submitted."). Such a request is not one to maintain the status quo—it is, rather, a paradigmatic example of a mandatory injunction. It is, therefore, "particularly disfavored" and "should not be granted" unless Plaintiffs can demonstrate "that the law and facts *clearly favor* their position" and that "extreme or very serious damage will result" unless this court issues a TRO. *Marlyn Nutraceuticals*, 571 F.3d at 878-79; *Garcia*, 786 F.3d at 740 (emphasis in original). Plaintiffs cannot carry that "doubly demanding burden" here, and this court should therefore deny their request for a TRO. *Garcia*, 786 F.3d at 740.

## C. Plaintiffs Have Not Demonstrated That They Are Likely to Suffer Irreparable Harm

Plaintiffs will not suffer any harm in the absence of emergency intervention by this Court. First, it is notable that the conditions that Plaintiffs contend gave rise to their inability to obtain the needed signatures had been known since before RTW began its signature gathering efforts. Plaintiffs were in control of when they filed their prospective petition and began the 90-day signature collection period. Despite months of knowledge, plaintiffs did not seek relief from this Court until two weeks *after* their deadline for obtaining signatures. Plaintiffs' delay in seeking any relief is the clearest indication that they will not suffer imminent, irreparable harm.

To obtain a temporary restraining order, plaintiffs must show that they will suffer *immediate and irreparable injury* in the absence of the requested relief. *Hodgers-Durgin v. Gustavo De La Vino*, 199 F.3d 1037 (9th Cir. 1999) ("The equitable remedy is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no

showing of any real or immediate threat that the plaintiff[s] will be wronged again – a 'likelihood of substantial and immediate irreparable injury.'"). "The propriety of a temporary restraining order, in particular, hinges on a significant threat of irreparable injury that must be imminent in nature." *Gish v. Newsom*, 2020 WL 1979970, at *3 (C.D. Cal. Apr. 23, 2020) (citing *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999); *Baldridge*, 844 F.2d at 674.

Even if the COVID-19 pandemic or summer heat events impacted Plaintiffs' ability to gather signatures, these impacts were known for months, and Plaintiffs did nothing. One-third of the way through its signature gathering campaign, on August 11, 2021, RTW publicly stated that it had gathered fewer than 6,000 signatures through a mix of paid advertisers and volunteers.[4] At that time, the RTW campaign manager, while noting the COVID-19 pandemic and heat, said that the lackluster showing was a result of the campaign not having enough money to hire paid signature gatherers.[5] On September 9, 2021, approximately two-thirds of the way through the signature-gathering efforts, RTW announced that it had just under 13,000 signatures—less than one-fifth of the total number needed. At that point, RTW reported having 18 paid petitioners and 15 volunteers knocking on doors.[6]

On September 22, 2021, RTW requested an extension of time from the City Elections Officer and received a response on September 24 denying that request. Plaintiffs then filed this lawsuit on October 4, 2021, two days before RTW's deadline for obtaining signatures. At each of these junctures, Plaintiffs could have requested relief if the plain application of Oregon law would cause them irreparable harm. But Plaintiffs took no action at any of these times. Instead, Plaintiffs waited for two weeks *after* the deadline for gathering signatures. Plaintiffs assert that they will be irreparably harmed absent this court taking the extraordinary step of intervening in

---

[4] https://www.oregonlive.com/news/2021/08/total-flop-effort-to-recall-portland-mayor-struggles-with-signature-drive.html
[5] https://www.opb.org/article/2021/08/11/portland-mayor-recall-ted-wheeler-signatures-campaign/
[6] https://www.wweek.com/news/city/2021/09/09/campaign-to-recall-wheeler-continues-to-struggle/

Page 9 - DEFENDANTS RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR
        TEMPORARY RESTRAINING ORDER

local election administration and the application of state law.[7] Plaintiffs repeated delay in seeking relief "implies a lack of urgency and irreparable harm." *Oakland Trib., Inc. v. Chron. Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985).

Plaintiffs' own lack of urgency is understandable because there is simply no irreparable harm that would result from the Court failing to intervene at this junction—particularly on an emergency basis. There is no approaching election or deadline that plaintiffs must meet to get on a ballot. Plaintiffs' recall ballot would be a separate, special election. Plaintiffs are further not prohibited from trying again in their efforts to successfully mount a recall campaign.[8] Further, even if this court were to ultimately agree fully with Plaintiffs on the merits, that decision and any relevant relief could be granted in the ordinary course after full briefing and development of the record, as Defendants are not taking any action at this time that impacts Plaintiffs or their ability to gather signatures. In short, Plaintiffs have not met the threshold showing that they face an imminent threat of irreparable harm if this court does not act.

### D.  Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims

#### 1.    Plaintiffs' federal claims are without merit.

Plaintiffs contend that, as applied to them, both the 90-day deadline imposed by ORS 249.875 and the signature threshold set forth in the Oregon Constitution violate the First Amendment. Plaintiffs are wrong because neither the petition deadline nor the signature threshold regulate speech. Rather, these requirements regulate the procedures for holding a special election to remove duly elected officials from office prior to expiration of their term.

---

[7] It is also notable that after delaying their request for two weeks after filing their Complaint, Plaintiffs requested an expedited hearing for the following day. (ECF 6 at 2). Conversely, Defendants have not been served, so they received no electronic notice of the TRO filing, and they were notified of the motion for TRO and scheduled hearing just one day in advance of the hearing.

[8] Plaintiffs are not restricted from making a new attempt to recall Mayor Wheeler. Cf. Or. Const. Art. II, Section 18(7) ("After one such petition and special election, no further recall petition shall be filed against the same officer during the term for which the officer was elected unless such further petitioners first pay into the public treasury which has paid such special election expenses, the whole amount of its expenses for the preceding special election.").

a.  **The First Amendment does not limit either deadlines or signature thresholds for recall elections.**

Plaintiffs cite *Meyer v. Grant*, 486 U.S. 414 (1988), *Angle v. Miller*, 673 F.3d 1122, 1132 (9th Cir. 2012), and *Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, (1997), for the proposition that their recall petition is political speech protected by the First Amendment. Plaintiffs fail to note that neither the Supreme Court, nor the Ninth Circuit, have ever held—not in *Meyer*, *Angle*, or *Buckley*—that applying signature thresholds or deadlines to regulate direct democracy implicates the First Amendment. In *Meyer*, the Supreme Court considered a challenge to a Colorado law that made it a felony to pay petition circulators. 486 U.S. at 416-17. Similarly, in *Buckley* the Supreme Court addressed Colorado requirements that petition circulators be registered voters, wear identification badges, and that initiative proponents report the names and addresses of paid circulators and the amounts they are paid. 525 U.S. at 186. In both cases, the Supreme Court analyzed laws that directly restricted individuals from engaging in political expression through petitioning. And in both cases the Supreme Court positively referenced signature threshold requirements as appropriate ways for the state to satisfy its interest in ensuring grass roots support for initiatives prior to placing them on the ballot. *Meyer*, 486 U.S. at 425-26; *Buckley*, 525 U.S. at 204-205.

*Angle* considered a facial challenge to a Nevada rule that required initiative proponents to meet a signature threshold in each congressional district in order to place an initiative on the ballot. 673 F.3d 1122 (9th Cir. 2012). In *Angle*, the Ninth Circuit rejected the proponents' attempt to apply *Meyer* and *Buckley*, which both "restrict one-on-one communication between petition circulators and voters," to the challenged threshold requirement. *Id*. at 1132. The court then assumed that the district-level signature thresholds triggered First Amendment scrutiny. It determined that even if the First Amendment applied, Nevada's regulations survived.

*Angle* expressly recognized that a law that regulates how petitioners communicate when seeking signatures is different than a law that defines the number of signatures a petition needs

Page 11 - DEFENDANTS RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

and by when ("ballot access restrictions"). 673 F.3d at 1132–34. However, *Angle* never

determined that "ballot access restrictions" for initiatives implicate the First Amendment. It only

held that *if* the First Amendment applied, the Nevada rule withstood scrutiny. 673 F.3d at 1133

("as applied to the initiative process, we assume that ballot access restrictions place a severe

burden on core political speech, and trigger strict scrutiny, when they significantly inhibit the

ability of initiative proponents to place initiatives on the ballot").

This court should not apply the Ninth Circuit dicta that "assumed" strict scrutiny would

apply when state law "significantly inhibit[s] the ability of initiative proponents to place initiatives

on the ballot." *Angle*, 673 F.3d at 1133. The Ninth Circuit has never held that is the

correct legal standard or that any state law violates that standard, not even in *Angle* itself.[9]

Moreover, recent case law further undermines this application of *Angle* to "ballot access

restrictions." Three recent district court decisions that relied on *Angle* are instructive. The

Supreme Court stayed two of those decisions. *See Little v. Reclaim Idaho*, 140 S. Ct. 2616

(2020); *Clarno v. People Not Politicians Oregon*, 141 S. Ct. 206 (2020). The Supreme Court

necessarily found that there was a "fair prospect" that the district court's application of *Angle*

would be reversed because "[e]ven assuming that the state laws at issue implicate the First

Amendment, such reasonable, nondiscretionary restrictions are almost certainly justified by the

important regulatory interests in combating fraud and ensuring that ballots are not cluttered with

initiatives that have not demonstrated sufficient grassroots support." *Reclaim Idaho*, 140 S. Ct. at

2617 (Roberts, C.J., concurring).[10] Plaintiffs notably omit these recent cases and the subsequent

stay of the injunctions by the Supreme Court, although Mr. Woolley cited the district court

---

[9] Judge Nelson has suggested that the Ninth Circuit should resolve the confusion wrought by
Angle by repudiating it en banc. *People Not Politicians Oregon v. Clarno*, 826 F. App'x 581,
591–92 (9th Cir. 2020).

[10] The two justices dissenting from those orders disagreed solely on procedural grounds: that the
Supreme Court stayed these decisions without allowing the Ninth Circuit a sufficient opportunity
to reverse their error. *See Reclaim Idaho*, 140 S. Ct. at 2618–19 (Sotomayor, J., dissenting).

decision in *People Not Politicians*, when contacting the City Elections Office.

Instead of the more fully adjudicated cases, Plaintiffs rely only on *Fair Maps Nevada v. Cegavske*, 463 F. Supp. 3d 1123 (D. Nev. May 29, 2020). Unlike the Oregon and Idaho cases, Nevada did not appeal the district court's ruling. *See Fair Maps Nevada v. Cegavske*, No. 3:20-cv-00271, Consent Decree, ECF No. 48 (D. Nev. June 9, 2020). And *Fair Maps Nevada* was decided without the benefit of the Supreme Court's decision in *Reclaim Idaho*.

At least five circuits have rejected applying strict scrutiny to "ballot access restrictions" for initiatives. *See Reclaim Idaho*, 140 S. Ct. 2616, slip op. at 2–3 (Roberts, C.J., concurring) (citing decisions of the Seventh, Eighth, and Tenth Circuits); *Marijuana Policy Project v. United States*, 304 F.3d 82, 85 (D.C. Cir. 2002); *Molinari v. Bloomberg*, 564 F.3d 587, 602 (2d Cir. 2009). The D.C. Circuit, for example, rejected a First Amendment challenge to a subject matter limitation on the initiative process. The court characterized the limitation as a "limit[] on legislative authority" rather than a "limit[] on legislative advocacy." *Marijuana Policy Project*, 304 F.3d at 85. It explained, "although the First Amendment protects public debate about legislation, it confers no right to legislate on a particular subject." *Id*. Given the weight of authority against the standard supposed by *Angle*, it is unlikely the Ninth Circuit would apply it even to initiative requirements. And rejecting *Angle*'s application would not violate Ninth Circuit precedent: the Ninth Circuit has never held the standard governs; it has only discussed the standard to recognize that Plaintiffs' claims would fail even under that "assumed" standard.

Additionally, even if courts in the Ninth Circuit are required to apply *Angle*'s strict scrutiny to "ballot access restrictions" for initiative petitions, this court should not extend that decision to recall petitions. There is no right to recall under the federal Constitution. *Comm. to Recall Robert Menendez From the Off. of U.S. Senator v. Wells*, 7 A.3d 720, 749 (N.J. 2010). The Ninth Circuit has never suggested that the First Amendment limits state requirements for recall petitions, and the only district court (the same district court that Plaintiffs rely upon for

Page 13 - DEFENDANTS RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

*Fair Maps Nevada*) to consider the question has rejected *Angle*'s extension to that context. *See Fight for Nev. v. Cegavske*, 460 F. Supp. 3d 1049, 1055 (D. Nev. 2020) ("While there is certainly a federal protected right to vote and to associate for political purposes, the Court is not convinced that Plaintiff has adequately demonstrated that such federally protected rights extend to the filing of recall petitions.").

*Angle* contemplated that courts might scrutinize state requirements for initiative petitions in a manner that is "similar to the standard [courts] apply to ballot access restrictions regulating candidates," that is, whether "'reasonably diligent' candidates can normally gain a place on the ballot . . . ." 673 F.3d at 1133. But it is not reasonable to apply this standard to qualify for the ballot at a regularly scheduled election to petitions that would trigger a special election recall. As discussed further below, no state makes it as easy to recall a sitting elected official as it does to qualify for the ballot. Seeking to shorten an elected official's term through a recall election is rightfully more difficult than the process for a candidate to qualify for a primary or general election ballot.

> **b.    Neither the 90-day deadline nor the signature threshold impose severe burdens on Plaintiffs.**

Even if the *Angle* standard applies to recall petition requirements, Plaintiffs have not shown that either the 90-day deadline or the signature threshold "impose[] severe burdens" on the rights. 673 F.3d at 1134–35. In fact, Plaintiffs merely contend, as discussed below, that the pandemic, high summer temperatures, and labor market forces, burdened their signature gathering campaign. In the absence of any showing of a severe burden, "the state need show only that the rule furthers 'an important regulatory interest.'" *Id.*

Plaintiffs first contend that the 90-day deadline restricts one-on-one communication because it only allows that communication for a specified amount of time and it limits the number of voices to people who knew of the recall petition campaign. (ECF 4 at 21). This extremely broad reading of what constitutes a one-on-one communication would have the

Page 14 - DEFENDANTS RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

unbounded result of allowing no regulation of petitions and no timelines for obtaining signatures. All laws and regulations of elections would constitute one-on-one communication restrictions. This expansive reading is inconsistent with *Meyer* and *Buckley*, which addressed laws that specifically restricted who could petition and how they did so. 486 U.S. at 422, 525 U.S. at 194-95.

Plaintiffs next contend that the 90-day limit and signature threshold make it less likely that they would succeed at triggering a recall. But *Angle* made clear "[t]here is no First Amendment right to place an initiative on the ballot." 673 F.3d at 1133. "Regulations that make it more difficult to qualify an initiative for the ballot therefore do not necessarily place a direct burden on First Amendment rights." *Id.*

Here, Plaintiffs rely heavily on *Fair Maps Nevada*, for the inward-looking test that simply considers whether Plaintiffs were reasonably diligent, and the restrictions inhibited their ability to trigger a special recall election. Plaintiffs' reliance on *Fair Maps Nevada*, is misplaced for the reasons discussed above. Moreover, the standard cited by Plaintiffs is not the standard set forth in *Angle*. In *Angle*, the court looked to the standard applied to candidate ballot access restrictions, which require "'the burden on plaintiffs' rights should be measured by whether, in light of the entire statutory scheme regulating ballot access, 'reasonably diligent' candidates can normally gain a place on the ballot, or whether they will rarely succeed in doing so." *Angle*, 673 F.3d at 1133 (quoting *Nader v. Brewer*, 531 F.3d 1028, 1035 (9th Cir. 2008).

Plaintiffs appear to argue that because they worked hard to gather signatures, but were unsuccessful, the 90-day deadline and signature thresholds must impose a severe burden. But the standard doesn't look to Plaintiffs' efforts or their success or failure. The standard looks at whether a reasonably diligent campaign can normally succeed or would rarely do so.[11] Plaintiffs do not point to any evidence that comparable campaigns have been unable to successfully

---

[11] As discussed above, applying the standard for candidate ballot restrictions to recall petitions that trigger special elections is not reasonable.

petition for a recall in light of the overall regulatory scheme. In fact, petitioners in Oregon City successfully gathered enough signatures to recall Mayor Holladay in September 2020, resulting in a special recall election on November 10, 2020.[12]

And Plaintiffs' reliance on the pandemic, labor shortages, and weather, all factors that are outside of the City's control and not part of regulation of the recall petition process does not change the analysis. First, appellate courts have soundly rejected arguments that district courts must modify state petition rules in light of the pandemic. *See Little v. Reclaim Idaho*, 140 S. Ct. 2616 (2020) (staying an injunction that changed the rules for ballot initiatives during the pandemic); *Clarno v. People Not Politicians Oregon*, 141 S. Ct. 206 (2020) (staying an injunction that had altered the State's signature and deadline requirements for placing initiatives on the ballot during the pandemic); *Miller v. Thurston*, 967 F.3d 727, 741 (8th Cir. 2020) (rejecting claim that requiring "in-person signatures" was unconstitutional during pandemic); *Thompson v. DeWine*, 976 F.3d 610, 618 (6th Cir. 2020) (reversing preliminary injunction requiring, inter alia, state to extend the deadline for submission).

Second, Plaintiffs' citation, without argument, to several election-related district court cases in 2020, at the very beginning of the pandemic, does not advance their position. (ECF 4 at 14-17). Importantly, these cases arose as a result of stay-at-home orders and group gathering restrictions that are no longer in effect and were not in effect during RTW's signature gathering campaign. *See Democratic National Committee v. Bostelmann*, 451 F. Supp. 3d 952, 982-983 (W.D. Wis. 2020) (issued following the Governor's "'Safer-at-Home Order,' requiring all Wisconsinites to shelter in place to slow the spread of COVID-19 until April 24, 2020[.]"); *Fair Maps Nevada v. Cegavske*, 463 F. Supp. 3d 1123, 1145-1147 (D. Nev. 2020) (relying on the fact that Nevadans were required to stay home for six weeks); *Faulkner v. Va. Dep't of Elections*, 104 Va. Cir. 373 (Va. Cir. Ct. Mar. 25, 2020) (decision predicated on the Governor's order prohibiting gatherings of ten or

---

[12] https://dochub.clackamas.us/documents/drupal/1222cba5-0b84-42d9-b58a-6e2a3ec7b9678.

more people); *Goldstein v. Sec'y of Commonwealth*, 484 Mass. 516, 517 (2020) (suspending signature requirements in light of shelter in place order); *SawariMedia LLC v. Whitmer*, 466 F. Supp. 3d 758, 774 (E.D. Mich. 2020) (order regarding signature requirements based on stay home order and a lockdown of non-essential in-person work, in-person public and private gatherings).

Plaintiffs point to Governor Brown's Stay Home, Save Lives order, the banning of large public gatherings, and social distancing requirements. (ECF 4, at 25). But these were simply not in place during RTW's signature-gathering period. On June 30, 2021, Governor Brown rescinded Executive Order 20-66, lifting masking, social distancing, and gathering restrictions. Even when Governor Brown reinstituted the requirement to wear masks outside when social distancing was not possible, this restriction was not comparable to the stay home orders that gave rise to election-related injunctions in 2020. Moreover, by July 2021, restrictions and requirements related to the pandemic were unsurprising, as were changes in people's behavior. By the time Plaintiffs filed their prospective petition there was that they would have been unable to adapt to changes that had resulted because of the pandemic.

In apparent recognition of the significant change in governmental restrictions between 2020 and 2021, Plaintiffs turn to voluntary behavioral changes of potential signatories and less than one week of very hot weather in August to explain why the 90-day deadline and signature threshold create a severe burden.[13] But aside from anecdotal descriptions of collecting fewer signatures at MAX stations or other unspecified high-foot traffic locations, Plaintiffs present no evidence of how the City's restrictions, the pandemic, the heatwave, or labor shortages prevented them from obtaining the necessary signatures within the 90-day deadline. Plaintiffs cite to a labor shortage resulting from federal unemployment benefits, but present no evidence regarding the number of paid petitioners they were able to hire or how that compares to similar recall petition

---

[13] Although Plaintiffs point to the devastating and historic heatwave in June 2021, they filed their prospective petition over a week after that heatwave. It could not have impacted their ability to gather signatures.

Page 17 - DEFENDANTS RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

campaigns. Similarly, Plaintiffs note a heatwave in August resulted in a lost week of work, but that does not explain the comparably limited signature gathering pace in both July and September.

Finally, appellate courts have stayed a slew of other district court decisions enjoining state election laws that plaintiffs claimed burdened their right to vote as applied during a pandemic. *See, e.g., Andino v. Middleton*, 141 S. Ct. 9 (2020); *Merrill v. People First of Alabama*, 141 S. Ct. 190 (2020) (staying an injunction that had suspended some state election rules during the pandemic); *Mi Familia Vota v. Hobbs*, 977 F.3d 948, 952 (9th Cir. 2020) (staying extension of Arizona's voter registration deadline). These decisions recognize that "a State legislature's decision either to keep or to make changes to election rules to address COVID–19 ordinarily 'should not be subject to second-guessing by an unelected federal judiciary, which lacks the background, competence, and expertise to assess public health and is not accountable to the people.'" *Andino*, 141 S. Ct. at 10 (Kavanaugh, J., concurring in stay issued without noted dissent).

Even if the *Angle* severe burden analysis applied to "ballot access restrictions," like the 90-day deadline and the signature thresholds, Plaintiffs have not demonstrated that these requirements impose a severe burden on Plaintiffs' right to petition.

### c.    The State and the City have an important interest in the orderly and fair regulation of elections.

Because Plaintiffs do not show that either the 90-day deadline or the signature threshold impose severe burdens, "[e]ven assuming that" recall requirements "implicate the First Amendment," the Defendants have an "important regulatory interest[] in . . . ensuring that ballots are not cluttered with initiatives that have not demonstrated sufficient grassroots support." *Reclaim Idaho*, 140 S. Ct. at 2617 (Roberts, C.J., concurring for four justices). The same reasoning applies with even greater force to recall elections. Recalls typically are held at special elections, which tend to have far lower turnout than a general election, and therefore may not

Page 18 - DEFENDANTS RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

reflect the will of the electorate as a whole.[14]

The 90-day deadline serves an important interest in preventing petitioners' manipulation of the recall process. Shortly after the advent of the recall, the need for legislation to prevent stretching out a recall process over an elected official's term was apparent: "'It is possible that a recall petition, based upon good grounds or not, may be circulated, and then when completed or nearly completed, be put in "cold storage" to await a more convenient opportunity for a sudden assault upon the officer involved.'" Att'y Gen. Op., No. 7290 (quoting J. D. Barnett, Operation of Initiative, Referendum, and Recall in Oregon, at 211 (1915)). "Such a program could be employed to bully and control officials." *Id.* Even beyond this specific abusive practice, the State has an interest in limiting petitioners' capacity to manipulate the timing of special elections for political advantage. *Cf.* Marc Meredith, "The Strategic Timing of Direct Democracy," 21 Economics and Politics 159 (2009) (finding that political actors "strategically time [special] elections" and "that the strategic timing of elections affects outcomes").

The Court should be particularly reluctant to invalidate Oregon's recall deadline, because similar deadlines are "commonplace" among states that allow recalls. *See Angle*, 673 F.3d at 1130–31 (upholding requirement because "[a]lthough geographic distribution requirements are commonplace at the ballot access stage, we are not aware of any judicial decision invalidating them"). Of the 19 states that allow recalls of state officials, only Alaska and North Dakota have no time limit for circulating such petitions. National Conference of State Legislatures, Recall of State Officials: Process (July 8, 2019), https://www.ncsl.org/research/elections-andcampaigns/recall-of-state-officials.aspx. And, of the states allowing three months or less, 7 require more signatures than the 15 percent of voters that Oregon requires. *Id.* Even if this court extends *Angle* to scrutinize a state's requirements to recall an elected official, Plaintiffs' claim of

---

[14] Importantly, none of the cases Plaintiffs cite for courts modifying election regulations related to recall petitions. (ECF 4 at 14-17).

Page 19 - DEFENDANTS RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

a First Amendment violation is without merit.

>   **2.    Plaintiffs' claims are barred by the Eleventh Amendment because they seek retrospective relief against public officials who performed duties imposed by state law.**

Plaintiffs' claims also fail on jurisdictional, Eleventh Amendment grounds. Here, the filing deadline that plaintiffs challenge was set by state law—specifically ORS 249.875—and was mandatory. The same is true of the number of signatures that had to be submitted on the recall petition. ORS 249.870. And the same is true of the form on which the signatures had to be submitted. ORS 249.009. Neither those statutes nor the Oregon Constitution gave defendants any authority to waive the deadline and signature requirements to qualify for the ballot. Furthermore, defendants, as Auditor and Elections Officer, were merely performing a ministerial function of the state in enforcing those laws. For the purposes of this complaint, defendants are therefore considered to be state officials for Eleventh Amendment purposes. *See Carter v. City of Philadelphia*, 181 F.3d 339, 353 (3d Cir. 1999) ("county or municipal law enforcement officials may be State officials when they * * * carry out policies established by the State"); *Purcell ex rel. Estate of Morgan v. Toombs County, Ga*, 400 F.3d 1313, 1324–1325 (11th Cir. 2005) (holding that county sheriff sued in his official capacity was entitled to Eleventh Amendment immunity because authority to administer jail "flows from the state, not the County.")

The Eleventh Amendment bars federal courts from issuing declaratory and injunctive relief against state officials sued in their official capacity when no continuing violations exist. *Green v. Mansour,* 474 U.S. 64, 73-74 (1985); *see also Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002) (explaining that the *Ex parte Young* exception to immunity allows suits against state officials but only for prospective relief for ongoing violations of federal law). Here, plaintiffs seek injunctive relief related to the constitutionality of Defendants' *past* actions in enforcing various state laws up to the October 6 deadline to qualify for the ballot. (*See* Complaint at pp. 23-24) (prayer for relief). In other words, Plaintiffs seek to

"unring" the proverbial bell. But because Plaintiffs' claims seek retrospective relief against officials performing a ministerial duty imposed by state law, those claims are barred by the Eleventh Amendment.

Put differently, Plaintiffs bring as-applied challenges to deadlines and signature requirements imposed by state law in a process that has now been completed: the deadline to submit the recall petition expired on October 6. And Plaintiffs do not allege that Defendants are engaged in any "future and ongoing illegality" justifying prospective relief. *See Porter v. Jones*, 319 F.3d 483, 491 (9th Cir. 2003) (holding that Eleventh Amendment did not bar suit against public official because plaintiffs sought prospective relief to "prevent ongoing and future illegality"). Plaintiffs' claims against Defendants are therefore barred by the Eleventh Amendment, and they cannot show otherwise.

### 3.    This court does not have jurisdiction over Plaintiffs' state-law claim.

Furthermore, and independently of the above, this court does not have jurisdiction over plaintiffs' state-law claim. (*See* Compl., ECF 1 at 21) (alleging violation of the Oregon Constitution). "The Eleventh Amendment bars a suit against state officials when 'the state is the real, substantial party in interest.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984) (quoting *Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 464 (1945)). As mentioned previously, under the doctrine of *Ex Parte Young*, "when a plaintiff sues a state official alleging a violation of *federal* law, the federal court may award an injunction that governs the official's future conduct …." *Pennhurst*, 465 U.S. at 102–03 (emphass added). But *Ex Parte Young* is "inapplicable in a suit against state officials on the basis of state law." *Id.* at 106 (further noting, "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law.")

Accordingly, "the Eleventh Amendment deprives federal courts of jurisdiction to order state actors to comply with state law." *Hale v. State of Ariz.*, 967 F.2d 1356, 1369 (9th Cir.

1992), *on reh'g*, 993 F.2d 1387 (9th Cir. 1993). The same is true of a complaint that—as here—alleges a state constitutional violation. *See Vulliet v. Oregon*, No. 6:12-cv-492-AA, 2012 WL 4863710, at *6 (D. Or. Oct 10, 2012), *aff'd*, 701 Fed. Appx. 579 (9th Cir. 2017) (holding that "plaintiff cannot bring a claim alleging violations of the Oregon Constitution" because "[t]he Eleventh Amendment bars the adjudication of pendent state law claims against nonconsenting state defendants in federal court") (internal citations and quotation marks omitted).

Here, as noted previously, defendants were performing ministerial duties imposed by state law. *See Weiner v. San Diego Cty.*, 210 F.3d 1025, 1029 (9th Cir. 2000) (holding district attorneys were considered state officers when they made prosecutorial decisions under the supervision of state, not county, officials). Plaintiffs seek retrospective declaratory relief to the effect that "the application of ORS 249.875(1) and all related laws, rules, or policies violates the Oregon Constitution" and that "the application of ORS 249.875(1) and all related laws, rules, or policies, as applied to the Recall, violates the Oregon Constitution * * *." (Compl., ECF 1, at 23). And they ask this court to "enjoin enforcement" of those state laws as applied to them. *Id.* Because plaintiffs seek to prevent the application of state law, the relief they seek runs against the state. As the Supreme Court has held, however, "a suit against officials of a county or other governmental entity is barred if the relief obtained runs against the State." *Pennhurst*, 465 U.S. at 123 n.34.

In sum, the Eleventh Amendment "deprives federal courts of jurisdiction" to order local officials to comply with the courts' own interpretation of state law. *Hale*, 967 F.2d at 1369. Defendants are therefore entitled to immunity under the Eleventh Amendment against Plaintiffs' state-law claim, and plaintiffs cannot show otherwise.

### 4. Plaintiffs have not shown a likelihood of success on their state law claim.

Plaintiffs contend, without much explanation or argument, that because the Oregon Constitutional provision on recall elections present no durational limit, it is improper for

Defendants to apply the 90-day deadline required by ORS 249.875(1). Plaintiffs ignore that the Oregon Constitution authorizes legislation to establish procedures for the exercise of the right to recall, such as the 90-day deadline established by ORS 249.875(1)[15].

The Constitution specifically provides that "additional legislation as may aid the operation of this section [i.e., Article II, § 18] shall be provided by the legislative assembly …." Art. II, § 18(8). It expressly contemplates that legislation will supplement the constitutional recall provisions—legislation like the 90-day deadline. Plaintiffs are not likely to succeed on the merits of their claim that application of the 90-day deadline in ORS 249.875 violates the Oregon Constitution.

**E. Plaintiffs Have Not Established That the Balance of Equities Weigh in Their Favor or That a Temporary Restraining Order Is in the Public Interest**

Plaintiffs seeking a preliminary injunction or temporary restraining order must establish not only that they are likely to succeed on the merits and are likely to suffer irreparable harm in the absence of preliminary relief, but also that the balance of equities tips in their favor, and that an injunction is in the public interest. *Winter,* 555 U.S. at 20 (2008). "In exercising their sound discretion, courts of equity should pay particular regard for the public . . . consequences in employing the extraordinary remedy of injunction." *Id*. at 24 (internal citations omitted).

Plaintiffs dismiss Defendants' and the public's interest in orderly and predictable elections. Instead, Plaintiffs contend that the only harm to Defendants is a minor adjustment to the timing and scope of the administrative function of verifying signatures. In fact, both Defendants and the public have a substantial interest in ensuring that there are clear rules and finality in electoral processes. Unwillingness to accept election laws and processes when they do not produce a person's desired outcome undermines our democracy. As the Supreme Court has

---

[15] Plaintiffs also fail to address that the Oregon Constitution sets the fifteen percent signature threshold that they ask this court to enjoin. Art. II, § 18(2).

explained, "'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.'" *Burdick v. Takushi,* 504 U.S. 428, 433 (1992) (quoting *Storer v. Brown,* 415 U.S. 724, 730 (1974)). Correct application of the signature thresholds and 90-day deadline for recall petitions set forth in Oregon law is necessary to ensuring fair and honest elections.

Plaintiffs assert that Defendants' even-handed application of well-known deadlines and signature thresholds bar Plaintiffs from placing their attempted recall before voters. Not so. Plaintiffs, in fact, can file another prospective recall petition, and gather signatures unhindered by either high heat or federal unemployment benefits.

Defendants' extraordinary interest in the fair and proper functioning of democratic elections, including recall efforts, outweighs Plaintiffs' interests in holding a recall vote; an interest that they can pursue again at any time.

DATED: October 22, 2021.

Respectfully submitted,

*/s/ Naomi Sheffield*
Naomi Sheffield, OSB #170601
Sr. Deputy City Attorney
naomi.sheffield@portlandoregon.gov
DENIS VANNIER, OSB No. 044406
Sr. Deputy City Attorney
denis.vannier@portlandoregon.gov
*Of Attorneys for Defendants Mary Hull*
*Caballero and Louise Hansen*